[S. F. Nos. 568 and 599.   In Bank.—January 15, 1897.]

SIDNEY V. SMITH ET AL., RESPONDENTS, *v.* SAN FRANCISCO & NORTH PACIFIC RAILWAY COMPANY ET AL., APPELLANTS.

CORPORATIONS—ELECTION OF DIRECTORS—PERSONS ENTITLED TO VOTE—CONSTRUCTION OF CODE—BONA FIDE STOCKHOLDERS—DUMMY HOLDERS OF STOCK DISQUALIFIED.—Under section 312 of the Civil Code, only those who are *bona fide* stockholders having stock in their own name on the stock-books of the corporation, at least ten days prior to the election of directors, are entitled to vote at such election; and the holders of stock standing in their names, who do not hold it in a representative capacity, or as trustees of an express trust, or as pledgees, and who have no interest in the stock, and are only dummies for the real owners, the object of the registration being for the admitted purpose of enabling the real owners to avoid statutory liabilities, are not

*bona fide* stockholders within the meaning of that section, and can neither vote such stock nor give a lawful proxy therefor.

ID.—AGREEMENT TO COMBINE STOCK FOR VOTING PURPOSES—PUBLIC POL-ICY— CONSTRUCTION OF CONTRACT — PROXY — CONSIDERATION—INEVI-TABLE POWER.—An agreement between three persons for the purchase, as an entirety, of railway stock ordered to be sold in the course of ad-ministration of the estate of a deceased person, and that, in order to se-cure the control of the management and business policy of the railway company, they would combine the stock purchased so that it should be voted as a unit for the period of five years, the vote to be cast to be de-termined by ballot between them, is not void as against public policy, and is to be construed as implying that the majority of them shall deter-mine how all the shares purchased are to be voted, and as giving to the majority the authority to vote the stock of the other owner by proxy, and such agreement having been made in consideration of the purchase of the stock, the proxy is in the nature of a power coupled with an in-terest which cannot be revoked at the pleasure of either of the parties.

ID.—RESTRAINT OF TRADE—LIMITATIONS UPON DISPOSITION OF PROPERTY. The rule invalidating contracts in restraint of trade does not include every contract limiting the right of the owner of property to dispose of it except upon certain conditions; and an agreement between two or more persons who contemplate the purchase of property that, as a con-dition of the purchase, neither will dispose of his share within a limited period, or that they will hold it upon certain limitations, is not invalid, as being in restraint of trade.

ID.—SEPARATION OF VOTING POWER FROM OWNERSHIP OF STOCK. — It is not illegal or against public policy to separate the voting power from the ownership of stock, by an irrevocable proxy given upon a sufficient consideration, when it is not appointed for an unlawful purpose, or where no unlawful end is attempted to be effected by the exercise of the vot-ing power.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial.  J. M. SEAWELL, Judge.

The facts are stated in the opinion of the court.

*W. S. Goodfellow, Jesse W. Lilienthal,* and *Garret W. McEnerney,* for Appellants.

The stock-books of a corporation are not conclusive evidence of the right to vote at stockholders' meetings. (Const. art. 12, sec. 12; Civ. Code, secs, 298, 312, 315; Thompson on Corporations, secs. 742, 3259; *Allen* v. *Hill,* 16 Cal. 113; *Brewster* v. *Hartley,* 37 Cal. 15; 99 Am. Dec. 237; *Stewart* v. *Mahoney Min. Co.,* 54 Cal. 149; *People* v. *Robinson,* 64 Cal. 373; *Graves* v. *Mono Lake etc.*

*Co.*, 81 Cal. 303; *State ·v. Leete*, 16 Nev. 242; *State* v. *Smith*, 15 Or. 98, 118; *People* v. *Devin*, 17 Ill. 84; Cook on Stockholders, sec. 263; *Rowe* v. *Rand*, 111 Ind. 206; *M'Naughton* v. *Moore*, 1 Hayw. (N. C.) 217.) The agreement of March 22, 1893, which required the entire holdings of Smith, Foster, Markham, and their associates, to be voted as a unit according to a ballot made by Foster, Markham, and Smith, constituted a proxy to vote those shares in accordance with the ballot. (Morawetz on Corporations, sec. 486, and cases; 1 Am. & Eng. Ency. of Law, 2d ed., 957, and cases; Civ. Code, secs. 12, 1649, 1654; *Rankin* v. *Amazon Ins. Co.*, 89 Cal. 209; 23 Am. St. Rep. 460; *Chater* v. *San Francisco Sugar Refining Co.*, 19 Cal. 220; *Shorb* v. *Beaudry*, 56 Cal. 450; *Cornell* v. *Corbin*, 64 Cal. 197.) The court erred in excluding evidence to show under what circumstances these agreements were made. (Code Civ. Proc., sec. 1860.)

*Page, McCutchen & Eells*, for Respondents.

The stock-books of the corporation are conclusive evidence of the right to vote at stockholders' meetings; in the absence of an objection by the real owner of the stock. (*Market Street Ry. Co.* v. *Hellman*, 109 Cal. 589; *People* v. *Robinson*, 64 Cal. 373; *Bank of Commerce's Appeal*, 73 Pa. St. 59; Thompson on Liability of Stockholders, sec. 217; *Johnson* v. *Underhill*, 52 N. Y. 203; *Castellan* v. *Hobson*, L. R. 10 Eq. 47; *Ex parte Willcocks*, 7 Cow. 411; 17 Am. Dec. 525; *Matter of Barker*, 6 Wend. 509; *In re Mohawk etc. R. R. Co.*, 19 Wend. 135; *Matter of St. Lawrence Steamboat Co.*, 44 N. J. L. 539; *Hoppin* v. *Buffum*, 9 R. I. 513; 11 Am. Rep. 291; *In re Argus Printing Co.*, 1 N. Dak. 434; 26 Am. St. Rep. 639; *White* v. *Ferris*, 42 Conn. 560; *Pender* v. *Lushington*, L. R. 6 Ch. Div. 70; *Matter of St. Lawrence Steamboat Co.*, *supra; State* v. *Leete*, 16 Nev. 242.) The contract between Foster, Markham, and Smith, was not in form or essence a proxy. (Civ. Code, sec. 307; *Market Street Ry. Co.* v. *Hellman*, 109 Cal. 589.)

HARRISON, J.—At the election for directors of the San Francisco & North Pacific Railway Company, which was had at the annual meeting of the stockholders held February 25, 1896, the votes offered by Peter Gundecker, G. E. Wagner, and Sidney V. Smith, in whose names certain shares of stock stood on the books of the corporation, were rejected, and, at the close of the election, the chairman of the meeting announced that Antoine Borel, A. W. Foster, Andrew Markham, P. N. Lilienthal, George A. Newhall, James B. Stetson, and John L. Howard, had been duly elected directors of said corporation for the year then next ensuing. The votes of Gundecker and Wagner were rejected upon the ground that they were not *bona fide* stockholders in the corporation, and the vote of Smith was rejected upon the ground that by virtue of a certain agreement between him and two other stockholders—Foster and Markham —the stock of the three had been pooled for the term of five years, to be voted as a unit, and was cast in pursuance of that agreement. If the votes thus rejected had been received, the election would have resulted in the choice of Smith as one of the directors instead of Lilienthal. The present action was brought under section 315 of the Civil Code, for the purpose of having it declared that Smith instead of Lilienthal was elected a director at said election. The superior court found that Gundecker and Wagner were *bona fide* stockholders, and that their vote should have been received, and that the agreement by Smith with the other stockholders did not preclude him from the right to vote the stock standing in his own name as he might choose, and that the vote by the other stockholders for his stock was unauthorized, and his own vote should have been received. Judgment was thereupon rendered that Lilienthal had not been chosen as a director, and was not entitled to exercise the office, and that at the said election Smith was chosen one of the directors, and was entitled to be so recognized. A motion for a new trial on behalf of the defendants was denied, and from both the judg-

ment and the order denying the new trial appeals have been taken.

1. *The Gundecker and Wagner Stock.*—At the time of the election, and for more than ten days prior thereto, there was standing upon the books of the corporation four thousand two hundred shares of stock in the name of Peter Gundecker, and four thousand four hundred and eighty-five shares in the name of G. E. Wagner, and they were represented at the election by Antoine Borel, to whom they had given their proxy. When their votes were tendered by Borel a protest was made against receiving them, upon the ground that neither of them was or had been a *bona fide* stockholder of the corporation, and thereupon the protest was sustained and the votes rejected. In support of the action of the chairman in rejecting these votes, it is alleged in the answer herein that neither Gundecker nor Wagner ever held or owned any shares of stock of the corporation, or was ever a *bona fide* stockholder therein; that the true owner of said shares was the firm of Ladenburg, Thalman & Co. of New York. At the hearing before the court an affidavit for a continuance was presented for the purpose of enabling the defendants to take the depositions of certain witnesses in New York, including Gundecker and Wagner, to establish this issue, and it was admitted by the plaintiffs that, if the witnesses were present, they would testify to the matters set forth in the affidavit, reserving, however, their objections to its materiality. The matters set forth in the affidavit are that, at the time Gundecker and Wagner gave their proxies to Borel, they were neither of them holders or owners of any stock in the defendant railway company, and had never held or owned any stock in said company, and that, at the time the shares were transferred to their names, they belonged to the firm of Ladenburg, Thalman & Co., who caused said shares to be so transferred to the names of Gundecker and Wagner, as dummies, so as to avoid for said Ladenburg, Thalman & Co. the liability of a stockholder for the debts of said

defendant railroad company.   When the defendants offered this admission of the plaintiffs in evidence, the court excluded it upon the objection of the plaintiffs that it was immaterial.   For the purpose of determining the present appeal, it must be assumed that, if the witnesses had testified in accordance with the admission of the plaintiffs, the court would have found the facts in accordance with their testimony, so that the real question to be determined is, whether, if such were the facts, the votes of Gundecker and Wagner should have been received, and this depends upon a proper construction of the provision in section 312 of the Civil Code, requiring every voter at an election for directors in a corporation to be "a *bona fide* stockholder, having stock in his own name on the stock-books of the corporation, at least ten days prior to the election."

The act in relation to corporations passed at the first session of the legislature of this state (Stats. 1850, p. 347) made different provisions for different kinds of corporations, and also different requirements on the part of the stockholders for the election of directors. The provision generally made in this respect was that the directors should be elected by the stockholders, and that "each stockholder shall be entitled to as many votes as he owns shares of stock in the company." (Stats. 1850, secs. 35, 105, 124, 187.)   The chapter relating to railroad companies provided (Stats. 1850, sec. 59) that the stockholder must have owned his stock for thirty days next preceding the election in order to entitle him to vote, and that "no stockholder shall vote at any such election upon any stock except such as he shall have owned for such thirty days"; and the chapter relating to bridge companies provided (Stats. 1850, sec. 159) that the stockholder could vote only upon such stock as he had "owned absolutely, or as executor, administrator, or guardian, for thirty days previous to such election."   The act authorizing the incorporation of mining and manufacturing companies passed in 1853 (Stats. 1853, sec. 5, p. 87) provided that "each

stockholder, either in person or by proxy, shall be entitled to as many votes as he owns shares of stock," and further provided (Stats. 1853, sec. 11): "Whenever any stock is held by any person as executor, administrator, guardian, or trustee, he shall represent such stock at all meetings of the company, and may vote accordingly as a stockholder." The statute, so far as it related to the incorporation of railroad companies, was revised and reenacted in 1861 (Stats. 1861, p. 607), and section 5 of that act provided that directors should be elected "by a majority of the votes of the stockholders being present in person or by written proxy; and every stockholder being so present, either in person or by proxy, at any election for directors, shall be entitled to give one vote for every share of stock which he may have owned for ten days next preceding such election; but no stockholder shall vote at any such election upon any stock, except such as he shall have owned for ten days." In none of these statutes was it provided that the stock owned by the stockholder should stand in his name upon the books of the corporation.

At the adoption of the Civil Code in 1872 the legislature sought to bring into a single system applicable to all corporations, so far as practicable, the entire method of corporate organization and management, and, having provided that directors should be chosen annually by the stockholders, provided in section 307 that every stockholder should have the right to vote in person or by proxy the number of shares standing in his name, "as provided in section 312." It is provided in section 312 that to entitle a person to vote he must be "a *bona fide* stockholder, having stock in his own name on the stock-books of the corporation at least ten days prior to the election." It is thus made as a requisite of the right to vote that the voter shall not only be registered as a stockholder, but that he shall have been so registered for at least ten days prior to the election, and that he shall also be a *bona fide* stockholder at the time of the election. The provision in section 313 that the

shares of stock of an estate of a minor or insane person may be "represented," that is, voted, by his guardian, and of a deceased person by his executor or administrator, indicates that these officers would be entitled to vote the stock without having it transferred to their own name. (See *In re Election of Cape May etc. Co.*, 51 N. J. L. 78.) These provisions are substantially those previously existing in reference to railroad corporations, although there is added thereto the requirement that the stock must stand in the name of the voter, and, while the requirement of section 159 of the act of 1850, that the stockholder must have owned the stock "absolutely" in order to entitle him to vote, is not preserved, it is now required that in all cases he must, at the time of the election, be a *"bona fide"* stockholder. The legislature having included this as a requirement, it must be assumed that something was intended thereby in addition to what was previously made a qualification for voting, and it is the duty of courts to ascertain this intention, and construe the words accordingly. Under the previous statutory provisions in this state it had been decided in *Allen* v. *Hill*, 16 Cal. 113, that the surviving partner of one in whose name stock belonging to the partnership was registered upon the books of the corporation had the right to represent and vote the stock at an election of officers, and that the administrator of the partner in whose name the stock was registered did not have such right, saying that "the real owner of stock should be entitled to represent it at the meetings of the corporation, and the mere fact that he does not appear as owner upon the books of the company should not exclude him from the privilege of doing so." In that decision the court pointed out the distinction between the statutes of this state, and in those states in which the transfer-books were made the exclusive evidence of the right to vote, and it is reasonable to suppose that the provision that the voter must have stock standing in his own name was made in view of that decision.

As early as 1825 the legislature of New York provided by statute that the transfer-books of an incorporated company should be the evidence of who were the stockholders of the company, and should determine the right of any claimant to vote at an election. This statute has remained in force in that state, and has been followed in other states by similar statutes, or, in the absence of any statute on the subject, by accepting the decisions thereunder as authority for determining the same question. (See *Downing* v. *Potts*, 23 N. J. L. 75; *Hoppin* v. *Buffun*, 9 R. I. 513; 11 Am. Rep. 291; *State* v. *Ferris*, 42 Conn. 560.) Under this statute it was held that a registered stockholder had the right to vote at an election of officers, even though he held the stock as trustee for others without any beneficial interest therein (*Ex parte Barker*, 6 Wend. 509), or, though his stock had been hypothecated for its full value (*Ex parte Willcocks*, 7 Cow. 402; 17 Am. Dec. 525); and when the stock belonging to a bank was registered in the name of its cashier, who held it merely in trust, and who had been superseded by another in that office, it was held that the vote of the registered stockholder should be received in preference to the vote tendered by his successor. (*In re Mohawk etc. R. R. Co.*, 19 Wend. 135.) It was, however, held in *Ex parte Holmes*, 5 Cow. 426, that where stock belonging to the corporation itself was registered in the name of an individual, he would not have the right to vote it, for the reason that since it was the property of the corporation it could not be voted at all. (See, also, *Brewster* v. *Hartley*, 37 Cal. 15; 99 Am. Dec. 237.) It may be assumed that at the adoption of the Civil Code in 1872, the legislature was aware of the provisions of the statutes of New York, and of the decisions thereunder, and those of similar import in other states, to the effect that the one who was registered as a stockholder was entitled to vote, even though, at the time of voting, he had no interest in the stock, and the insertion of the word *"bona fide"* as an element of his qualification, in addition to the other requirements of the sec-

tion, was doubtless made in view of such decisions. Under a statute requiring him to be the owner, it has been held sufficient that he be registered as the owner, and that the corporation could not inquire into the character of his ownership, but when he is required to be a *"bona fide* stockholder," the nature of the title under which he holds the stock is open to inquiry. It will be observed that the requirement is not that he shall be a *bona fide* "owner" of the stock, but that he shall be a *bona fide* stockholder. The provision in section 298 of the Civil Code, that the owners of stock are called stockholders, does not need or admit of the construction that only those are stockholders who are owners of stock. This section does not purport to be a definition of the term "stockholder," or to limit its extent, as would have been the case if it had said that stockholders are those who own the shares of stock in a corporation, but is consistent with holding that others may be stockholders than merely those who are the owners of the stock, and for the purpose of avoiding such construction, section 312 requires the voter at an election to be a *bona fide* stockholder. One may be a *bona fide* stockholder without being the owner of the stock. He may have caused himself to be registered as a stockholder in the utmost good faith, both toward the corporation and also toward his fellow stockholders, and yet he may not be the owner of the stock. The owner of the stock may have pledged it as security for his indebtedness, and the creditor may have caused it to be transferred to his own name upon the books of the corporation without changing its ownership. (Civ. Code, sec. 2888; *Hawley* v. *Brumagim,* 33 Cal. 394.) It may be placed in the name of one as trustee to hold under an express trust, without any interest in the stock, but for the sole purpose of applying the income or disposing of the proceeds of its sale according to the terms of the trust. It may be the property of an estate, and transferred into the name of the executor. In all such cases the transfer would be in good faith, and the person in whose name it was regis-

tered would be a *bona fide* stockholder. (*In re Argus Printing Co.*, 1 N. D. 434; 26 Am. St. Rep. 639.) The provisions of section 322 of the Civil Code, by which the liabilities of pledgees and trustees in whose names stock is registered are limited to that section, imply that such limitation does not exist in other relations which these persons sustain to the corporation, and corroborates the proposition that they are not to be precluded from voting at an election. Section 312 provides that "at all elections or votes had for any purpose, there must be a majority of the subscribed capital stock represented, either in person or by proxy in writing." But if stock that is registered in the name of a pledgee, or of a trustee, or of an executor, cannot be voted, it might not infrequently happen that a majority of the stock would not be represented at an election.

This section received a construction in *Stewart* v. *Mahoney Min. Co.*, 54 Cal. 149, and it was there held that one in whose name stock was registered upon the books of the corporation, but who had no interest therein, and was not the owner of any stock in the corporation, had no right to vote the stock; that he was neither the proxy nor the representative of the owners of the stock, nor a member of the corporation, and was, therefore, not a *bona fide* stockholder. The construction then given by the court to this section has never been modified, and must be regarded as a controlling authority in the present case. The case of *People* v. *Robinson*, 64 Cal. 373, involved only the construction of the act of 1853. It will be observed that in that case one of the considerations stated in the opinion upon which the decision was made was, that it did not appear that the right of the registered stockholder to vote as he did was challenged, or that his vendee attempted or claimed the right to cast the vote. That case, moreover, was not an action under section 315, but was in the nature of a *quo warranto* to oust the defendants from the offices of trustees.

It may not be easy, nor is it requisite under the facts

in this case, to formulate a definition of a *bona fide*
stockholder which shall cover all cases, or to draw a line
of exclusion by which the right to vote shall be deter-
mined; but we are very clear that one in whose name
stock has been registered upon the books of the corpo-
ration, but who has never had any interest in the stock,
and is only a dummy for the real owner, and when the
object of such registration was for the admitted purpose
of enabling the real owner to avoid certain statutory
liabilities, whether such purpose would be effectual or
not, is not a *bona fide* stockholder within the meaning
of this section, and should not be allowed to vote at an
election.

2. *The Smith stock.*—The exclusion of the vote tend-
ered by Smith upon the stock standing in his name was
by reason of the following facts: In February, 1893, the
estate of James M. Donahue, deceased, was the owner
of forty-two thousand shares or thereabouts of the capi-
tal stock of the defendant railway company, which the
superior court of Marin county had ordered to be sold
in the course of the administration of his estate.  Prior
to the sale an agreement was entered into between Smith,
Foster, and Markham for the purchase of this stock as
an entirety, upon the representations of Smith that
upon acquiring the shares an agreement would be made
by them whereby, in order to secure the control of the
management and business policy of the railway com-
pany, and for its prudent and economical management
in the interest of all of its stockholders, the said forty-
two thousand shares should, for the term of five years
thereafter, be voted as a unit in the election of directors
of said railway company.  In pursuance of this agree-
ment Smith and Foster, on the 24th of February, made
their joint bid for the shares, offering to purchase them
as an entirety for the sum of eight hundred thousand
dollars and upward, and by order of court their bid
was accepted, and on March 23d the sale was completed
and the price paid.  After the making of the bid, and
before the consummation of the purchase and comple-

tion of the sale, Smith prepared the agreement for the voting of the shares as a unit that had been contemplated by the parties to the purchase, and on the 22d of March the same was executed in triplicate between Smith, Markham, and Foster.   By this instrument, after reciting therein that the parties thereto had purchased the forty-two thousand shares of stock, and had agreed to retain the power of voting the stock for five years, "so as to keep the control of the corporation from passing to persons other than themselves," it was " mutually agreed between said Foster, Markham, and Smith that they will, during said period, retain the power to vote said shares in one body, and that the vote which shall be cast by said shares, whether for directors or for any other purpose, shall be determined by ballot between them or their survivors."  It was in the contemplation of the parties to the agreement that they might sell or otherwise dispose of some of the shares, and, accordingly, they made provision in this instrument for retaining the right to vote the stock so sold by them, and annexed thereto the form of an agreement to be taken by them from their vendees.   This form or draft recited the purchase of the forty-two thousand shares by Foster, Smith, and Markham, and that, "for the purpose of keeping control of said road in the interest of themselves and of all persons who shall buy any portion of the stock from them," they have agreed that for the period of five years " they shall vote the said stock in one block " at all elections for officers.'  The purchase of the stock by Foster, Smith, and Markham was completed and the price therefor paid on the 23d of March, and twelve thousand three hundred and thirty-six shares of the stock were transferred on the books to each of them —five thousand shares being left in the name of the Mercantile Trust Company, subject to some prior trust. Prior to the day for the election in 1896, a conference was called to be held between Foster, Smith, and Markham, upon proper notice therefor, to determine by ballot how the vote of the shares should be cast at the next

annual meeting for directors, and, in accordance with
said notice, said conference was held, at which Foster
and Markham were present, and, upon a ballot had
thereat, it was determined that said shares should be
voted for Markham, Newhall, and Lilienthal as directors.
The foregoing matters are alleged in the answer of the
defendants, and, at the trial, the defendants sought to
introduce in evidence the agreement of March 22d, and
offered to prove, in connection therewith, the matters
set forth in their answer relative thereto; but upon the
objection by the plaintiffs to this offer, "on the ground
that said agreement was not a proxy, and did not pro-
vide that any of the parties thereto should vote the
stock belonging to the other, and that it was revoked
before the election and was invalid as against public
policy," the evidence was excluded, the court saying:
"I will assume, for the purpose of my ruling, that it was
a valid agreement, but that it was not an agreement
which gave any authority to any other person to cast
the vote of Mr. Smith." As we have said with reference
to the Gundecker and Wagner stock, for the purpose of
this appeal it is to be assumed that the evidence offered
by the defendants would sustain the allegations of their
answer, and the sufficiency of these averments to au-
thorize the exclusion of the vote by Smith is to be deter-
mined. It was shown at the trial that at the meeting of
the stockholders, held on February 25th, Smith tendered
a vote for the shares standing in his name, and, at the
same time, Foster presented the vote of the same stock
by himself and Markham in behalf of Smith. Mutual
protests against the votes were made by different stock-
holders, and the vote cast by Foster and Markham was
received and counted, and that cast by Smith was re-
jected. Smith also testified that, after receiving the
notice for the conference to determine the ballot to be
cast, he informed Foster and Markham that he did not
recognize the validity or legality of the agreement, and
that he withdrew from the same, and would not be
bound by anything which they might do thereunder.

That the instrument of March 22d constitutes an agreement that the forty-two thousand shares are to be voted "in one body," and that the parties thereto agreed that "they" would vote the stock "in one block" is stated therein in express terms. By this instrument they also "mutually agreed" that "*the vote*" to be cast by said shares should be determined by ballot "between them" or their survivors. To "determine by ballot" is to ascertain the result of balloting upon a proposition by those entitled to cast the ballots; and the "vote"—that is, the voting paper or ticket to be cast for the officers, which the parties agreed should be thus determined—is to be the same for the entire forty-two thousand shares. That by virtue of this agreement an authority was given by each of the parties to the others to determine "the vote" to be cast by the forty-two thousand shares of stock is too clear for argument. When they mutually agreed that they would "determine" between them the vote which "shall be cast" for directors, they declared by necessary implication that such vote should be cast in accordance with the results of that ballot, and that if either of them should fail to cast the vote as should be determined by the ballot, the vote so determined might be cast by the others. If we should hold that this instrument is to be construed as not giving authority to the majority of the parties thereto to cast the vote of the entire forty-two thousand shares of stock, as might be determined upon such ballot, we should be compelled to hold that the instrument was prepared in disregard of the agreement between the parties, and of the purpose for which it was to be executed. If there is any ambiguity in the language used for the expression of that agreement, it is to be construed so as to carry the agreement into effect, rather than to defeat its operation. No particular form of words is requisite to constitute a proxy. (Morawetz on Corporations, sec. 486.) Like any other agency, the instrument by which it is created may be informal, but if, in order to give effect to its language in view of the purpose for which it is

executed, it is necessary to construe the instrument as creating an agency, such construction will be given.

The instrument executed between the parties must, therefore, be held to be a proxy, and to authorize the vote of the forty-two thousand shares of stock to be cast in accordance with the determination of the majority of the parties thereto, and, if it was made upon a consideration sufficient to bind the parties to its enforcement, it must be regarded as still operative.   One of the inducements for the purchase of the stock, and under which the parties entered into the agreement, was that the shares should be voted in one body, and held for five years as a unit.   It is immaterial that the voting agreement was not reduced to writing and executed until after the bid had been made for the stock.   It was so executed before the parties thereto had completed the purchase and become the owners of the stock by paying the purchase price.   Nor is the validity of the agreement or the effect of its terms different by reason of different certificates having been issued in the names of the several parties to the transaction, rather than in the name of one of them.   The agreement between them was with reference to the forty-two thousand shares of stock, and that it should be voted as a unit, and the purpose of the agreement was the economical management of the road, and to prevent irresponsible persons from getting control.   It was within the power of the parties to contract in reference to this property as fully as with regard to any other property.   They were at liberty to make as a condition of their purchase that its management should be held by either of them, or by a majority of the three, and the terms of the agreement for such purchase could not be repudiated by either after the purchase had been made.   It may be assumed that neither of the parties would have entered into the transaction, or agreed upon the purchase of the stock, except upon these conditions, and it must be held that each contributed his money to the purchase of the stock upon the promise made to him by the others.   There was thus a

sufficient consideration for the agreement granting the right to vote the stock. It was in the nature of a power coupled with an interest, and, being given for a valuable consideration, could not be revoked at the pleasure of either. (*Hey* v. *Dolphin*, 92 Hun, 230.)

Although the court in excluding this evidence, assumed that the instrument was valid, counsel for respondents have presented an argument in support of their further objection thereto, that the instrument is invalid by reason of being against public policy, and it therefore becomes necessary to consider this objection, inasmuch as the action of the court, rather than its reason for so acting, is to be reviewed; for, if the instrument is invalid, the refusal of the court to allow any effect to be gained from its exercise was proper.

"Public policy" is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Sir George Jessel, as Master of the Rolls, said in *Besant* v. *Wood*, L. R. 12 Ch. Div. 605, that public policy is "to a great extent a matter of individual opinion, because what one man or one judge might think against public policy, another might think altogether excellent public policy"; and in another case (*Printing etc. Co.* v. *Sampson*, L. R. 19 Eq. 465), the same jurist said: " If there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice." It is not in violation of any rule or principle of law for stockholders, who own a majority of the stock in a corporation, to cause its affairs to be managed in such way as they may think best calculated to further the ends of the corporation,

and, for this purpose, to appoint one or more proxies who shall vote in such a way as will carry out their plan. Nor is it against public policy for two or more stockholders to agree upon a course of corporate action, or upon the officers whom they will elect, and they may do this either by themselves, or through their proxies, or they may unite in the appointment of a single proxy to effect their purpose. Any plan of procedure they may agree upon implies a previous comparison of views, and there is nothing illegal in an agreement to be bound by the will of the majority as to the means by which the result shall be reached. If they are in accord as to the ultimate purpose, it is but reasonable that the will of the majority should prevail as to the mode by which it may be accomplished. It would not be an illegal agreement if articles of partnership should provide that stock in a corporation owned by the partnership, though standing in the individual names of the partners, should be voted by one of its members, and it is no more against public policy for such an agreement to be entered into between stockholders whose interests in the stock are separate than where their interests are joint. Viewed from considerations of public policy merely, it is immaterial whether such an agreement is made by the members of an existing partnership, which owns the shares, or in pursuance of an agreement by two or more persons to form a partnership for their purchase, or to purchase them for their joint account, or as one of the terms of an agreement for their purchase, by persons who contemplate no relation to each other further than that of owning stock in the same corporation. Such agreement would, in any case, be outside of the corporation and disconnected with the interest of every other stockholder, and, in either case, the same rules would control. Whether such an agreement is illegal, so that any action or vote under it can be set aside, or is of such a character that it will not be enforced, will depend upon the object with which it is made, or the acts that are done under

it, and will be governed by other rules of law. Mr.
Beach, in his treatise on Corporations, section 304, says:
"The owners of shares may enter into agreements as
between themselves to elect the officers of the company,
and to manage its affairs as they or a majority of them
shall determine, and it is held that agreements of that
character are not illegal nor void as against public pol-
icy; for, as was said by the court in a leading case,
their interests are identical with the interests of the
minority of shareholders." The authority thus referred
to is *Faulds* v. *Yates*, 57 Ill. 416; 11 Am. Rep. 24. In
that case Faulds was the owner of a majority of the
shares of stock in a corporation, and entered into an
agreement with the defendants in the nature of a part-
nership for the working of a mine, and for the purchase
by the defendants from him of two-thirds of his stock.
It was provided in the agreement between them that
they would elect the directors of the company; that they
would determine among themselves as to the officers
and management of the company; and that, if they
could not agree, they would ballot among themselves
for the directors and officers, and that the majority
should rule, and their vote be cast as a unit so as to
control the election. In an action for a dissolution and
accounting of their partnership, it was contended that
this portion of the agreement was void as against
public policy and was invalid for the reason that it
was in conflict with the interests of the other stock-
holders. The court, however, held otherwise, using the
following language: "There was nothing unlawful in
it. There was nothing which necessarily affected the
rights and interests of the minority. Three persons
owning a majority of the stock had the unquestioned
right to combine, and thus secure the board of directors
and the management of the property. If one man
owned a majority of the stock, he surely had the right
to select the agents for its honest management." In
*Hey* v. *Dolphin*, 92 Hun, 230, the parties were jointly
interested in certain shares of stock which had been

issued to them in a single certificate, and it was agreed between them that the stock should not be sold, or in any manner disposed of, or the certificates surrendered, for a period of ten years, without their joint consent in writing, but should remain as first issued, "for the purpose of enabling the said parties of the first part to prevent the control and management of the company from passing over to persons who might be less qualified or less disposed to make the business of the said company a success and its stock valuable." By the same agreement Dolphin was appointed a proxy to vote the whole of said shares at all elections, and the proxy was made irrevocable for ten years unless sooner revoked by joint consent. In an action brought for the purpose of having the agreement declared void, and that there be issued to the plaintiff certificates for one-half of the shares, the court held that the agreement was not void or against public policy, saying: "The object and purpose of the arrangement, as stated in the contract, is not of itself vicious, but rather the contrary. This is not a case where, as in some of the cases cited by the respondent, there is a combination of stockholders for the special benefit of some party, or where the power to cast the vote is in a party having no beneficial interest. The arrangement purported to be for the benefit of all the stockholders, and the attorney was one of the parties beneficially interested. It will hardly be claimed that a majority of stockholders may not combine to control an election of directors." (See, also, *Havemeyer* v. *Havemeyer,* 43 N. Y. Sup. Ct. 506; *Brown* v. *Pacific Mail S. S. Co.,* 5 Blatchf. 525.)

In cases of " voting trusts," where the owners of stock transfer the shares to trustees, with authority to vote at elections according to the direction of a majority of those holding trust certificates, and the only consideration for such transfer and agreement is the mutual promises of the several stockholders, it has been held that any stockholder may revoke his agreement and withdraw his stock at will; and it is also held that stock-

holders, who become such after an agreement of this nature is entered into, are not bound by its terms, but will hold their shares freed from the limitations of the agreement. (*Fisher* v. *Bush*, 35 Hun, 641; *Woodruff* v. *Dubuque etc. Co.*, 30 Fed. Rep. 91; *Brown* v. *Pacific Mail S. S. Co.*, 5 Blatchf. 525; *Griffith* v. *Jewett*, 15 Week. Law Bull. 419.) In *Moses* v. *Scott*, 84 Ala. 608, certain stockholders had formed a voting trust, and placed their stock in the hands of four trustees, with power to vote the stock as a unit at all meetings, as three of them should think best, or, if they failed to agree, as three-fourths of the stock represented should determine, and had agreed not to sell their stock so pooled for three years. There was no consideration for this agreement other than the mutual promise of the several stockholders; and, while the court refused to enforce the agreement concerning the sale, upon the ground that it was in restraint of the free alienation of property, it said: " We cannot say there is anything *per se* illegal in an agreement entered into by and between certain stockholders in a joint stock company by which they promise to vote together as a unit in all matters pertaining to the government of the corporation. Each member has the clear right to cast his ballot as he pleases, wisely or unwisely, and no other stockholder can control his conduct or gainsay his discretion, and it can make no difference if several stockholders uniformly vote together, or so vote in obedience to a prior agreement that they will do so. The vote, when cast, is but the expressed wish of the stockholder, or at least must be so regarded, and no other stockholder can be supposed to be injured thereby. To hold otherwise would greatly abridge the voter's right to cast his ballot as he pleased."

The agreement in question cannot be regarded as illegal by reason of being in restraint of trade. The rule invalidating contracts in restraint of trade does not include every contract of an individual by which his right to dispose of his property is limited or restrained. Section 1673 of the Civil Code makes void every con-

tract by which one is restrained from "exercising a lawful profession, trade, or business," except in certain instances. But this is far different from a contract limiting his right to dispose of a particular piece of property, except upon certain conditions. As the owner of property has the right to withhold it from sale, he can also, at the time of its sale, impose conditions upon its use without violating any rule of public policy, and there is nothing inconsistent with public policy for two or more persons, who contemplate purchasing certain property, to agree with each other, as a condition of the purchase, that neither will dispose of his share within a limited period, or for less than a fixed sum, or except upon certain limitations. They have the same right to contract with reference to the terms under which they will hold or dispose of the property after it shall have been purchased, as they have to agree upon any other terms upon which the purchase shall be made, and they no more violate a rule of public policy in making such agreement a consideration of their purchase than would two or more partners who should purchase property for partnership purposes, and agree that it should not be disposed of unless their vendee would assent to certain conditions regarding its use. These terms enter into, and form a part of, the consideration for the agreement to purchase, and are as binding and enforceable as any other terms of the agreement. (*New England Trust Co.* v. *Abbott,* 162 Mass. 148; *Hodge* v. *Sloan,* 107 N. Y. 244; 1 Am. St. Rep. 618; *Williams* v. *Montgomery,* 148 N. Y. 519; *Matthews* v. *Associated Press etc.,* 136 N. Y. 333; 32 Am. St. Rep. 741.) The contract in *Fisher* v. *Bush,* 35 Hun, 641, was held to be invalid for want of any other consideration than the mutual promise of the parties; but it was said in that case: " If these parties and their associates were the promoters of this corporation, then, doubtless, they could have entered into a valid agreement regulating a sale of the same, and requiring the owners to hold them from market for a reasonable and definite period of time, and thus forbidding

a sale by either of his interests to one against whom his associates might have a reasonable objection. (*Moffatt* v. *Farquhar*, 7 Ch. Div. 591; reported in 23 Moak Eng. Rep. 731.) A stipulation of that character would not be illegal as against public policy, as it would be simply a provision assented to by all that the newcomer into the business transaction should be with the approval of the other joint owners."

Neither is it illegal or against public policy to separate the voting power of the stock from its ownership. The statute authorizes the stockholder to vote by proxy; and it was held in *People's Bank* v. *Superior Court*, 104 Cal. 649, 43 Am. St. Rep. 147, that a by-law restricting the selection of proxies to stockholders was invalid; that the statute places no limitation upon the right of selection, and that a stockholder may appoint as his proxy one who is an entire stranger to the corporation. The right to appear by proxy implies of itself that the voting power may be separated from the ownership of the stock, and, unless the authority of the proxy is limited by the terms of his appointment, he is necessarily required to use his own discretion in any vote that he gives. Being the agent of the stockholder, he is required to exercise this discretion in behalf of his principal; but he is at liberty to use his own discretion as to the means by which his principal's interest will be best subserved. The cases in which it has been said that the stockholder could not divest himself of the voting power of his stock, and that it should not be separated from the ownership of the stock, were cases which involved either the sufficiency of the agreement by which the voting power was transferred, or the validity of the purpose for which the power was to be exercised. The proxy must exercise a discretion of the same nature as that which the stockholder is authorized to exercise, and an authority to do otherwise would be invalid; but the authority to exercise a discretion differs from an authority to perform a particular act. Under an appointment without words of limitation the proxy may

act. against the. interests of the stockholder, or even against the interests of the corporation, and the corporation, as well as the stockholder, will be bound by his act as fully as if the stockholder had acted in person, while, if the authority had been directed in terms to that act, it might have been invalid. The distinction is that between an unlawful exercise of a lawful power, and the attempt to authorize the exercise of an unlawful power. The question has been presented in cases of voting trusts, but an examination of these cases will show that the question has arisen either when the authority was expressly given to carry out some illegal purpose, or when, having been given without any consideration, though purporting to be for a definite term, subsequent owners of the stock have sought to revoke it before the expiration of the term. (*Shepaug Voting Trust cases*, 60 Conn. 553, sometimes reported under the name of *Bostwick* v. *Chapman; White* v. *Thomas Inflatable Tire Co.*, 52 N. J. Eq. 178.) We have. been cited to no instance where the purpose of a proxy given upon a sufficient consideration was lawful, and the person by whom the proxy was created continued to be the owner of the stock, in which the agreement has been held invalid. The stockholder cannot separate the voting power from his stock by selling his right to vote for a consideration personal to himself alone, any more than he could agree for the same consideration to cast the vote himself, and an agreement with others to appoint a proxy upon the same considerations would be equally invalid. In *Cone* v. *Russell*, 48 N. J. Eq. 208, an agreement by the purchaser of stock to give to other stockholders his irrevocable proxy for the purpose of securing and maintaining the control of the company was held invalid, for the reason that it was one of the terms of the agreement that the directors, to be elected under its provisions, should employ the one giving the proxy at a fixed salary during its existence. Such an agreement was held to. operate as an inducement to elect directors who would not act disinterestedly for the benefit of all of the stock-

holders, but rather to promote the interest of the parties to the agreement alone, and was therefore void, as being against public policy. The court, however, said: "This conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, where the object is to carry out a particular policy with the view to promote the best interests of all the stockholders." It was upon this principle that the agreements in *Hafer* v. *New York etc. R. R. Co.*, 14 Week. Law Bull. 68, *Guernsey* v. *Cook*, 120 Mass. 501, and *Fennessy* v. *Ross*, 5 N. Y. Sup. Ct. App. Div. 342, were held invalid. The same principle was declared in *Gage* v. *Fisher*, 65 N. W. Rep. 809. In *Mobile etc. R. R. Co.* v. *Nicholas*, 98 Ala. 92, the court held that there was nothing illegal or contrary to public policy in separating the voting power of the stock from its ownership, saying: "Where a proxy is duly constituted, and the power of the appointment is without limitation, the vote cast by the proxy binds the stockholder, whether exercised in behalf of his interest or not, to the same extent as if the vote had been cast by the stockholder in person. The invalidity of acts of this character by a proxy, rightly understood, is not made to rest upon the ground that there has been a separation of the voting power from the stockholders, but because of the unlawful purpose for which the proxy was appointed, or the unlawful end attempted to be effected by the exercise of the voting power."

From the foregoing considerations it follows that the superior court erred in finding that Gundecker and Wagner were *bona fide* stockholders in the defendant railway company, and also in refusing to receive in evidence the instrument of March 22d, and the evidence offered by the defendants in connection therewith, for the purpose of sustaining the averments of their answer.

The judgment and order denying a new trial are revered.

VAN FLEET, J., McFARLAND, J., and HENSHAW, J., concurred.

BEATTY, C. J., dissenting.—I dissent from the judgment and from the conclusions of the court on both of the principal points decided.

The contract between Smith, Markham, and Foster was, in my opinion, void as against the policy of the law giving to the holders of a majority of the stock of a corporation the right of control. Its sole purpose and object was to give to a minority of the stockholders the power to control the affairs of the corporation against the will of the majority, and that object is secured by means of this judgment. There is not time at my command to go over the decisions, but I am satisfied that the weight of authority is against the validity of any contract by which the sole owner of stock parts irrevocably with the right to vote it, with the effect of putting a minority in control of the corporation. As to the power of the chairman of a stockholders' meeting to refuse the vote of a registered stockholder upon the ground that he is not the *bona fide* owner of the stock standing in his name, I deny that it exists. As I construe sections 307 and 312 of the Civil Code, the registered stockholder must be allowed to vote; and if there is a claim that he is not the real owner of the stock which he has voted, that claim must be asserted and the remedy sought in the proceeding defined in section 315. To hold otherwise is to invest the chairman of the meeting with a power capable of the grossest abuse, and in its nature purely arbitrary; for there is neither time nor means of trying the question of ownership at the meeting. Nor is there any necessity for investing the chairman or the members present with any such power. The real owner of stock can always have it properly transferred and registered, and the failure to do so is his own fault. Or, if a case may sometimes arise in which the right of the owner to have the stock transferred on the books is delayed or impeded, he may enjoin the apparent owner from voting it. In other words, he has his remedy in his own hands in most

CXV. CAL.—39

cases, and in the rare instances in which it is otherwise the courts will afford him a remedy. But there is no adequate remedy for the registered stockholder whose vote is excluded merely because the chairman of a stockholders' meeting may choose, without notice, without pleading, and without evidence, to sustain an objection of some other stockholder that he is not really the owner of stock which appears to be his.

In this case, however, the objection was made by parties who themselves had no claim to the stock offered to be voted. It had been legally issued and regularly transferred by the owner to the persons in whose name it stood on the books, and the objection was that they were dummies to whom it had been transferred for the purpose of avoiding the stockholders' liability to creditors, etc. This was not, in my opinion, a valid objection to the right of the holders of the stock to vote it. The owners had a right to put it in the hands of trustees, and their motive for so doing was not open to inquiry for the purpose of this election. Creditors of the corporation could not be deprived of their action against the real owners by the transfer, nor could the corporation be deprived of its right to collect assessments; but only the creditors and the corporation could question the transaction, and they only in a proper proceeding for the enforcement of their rights.

Rehearing denied.