[No. B059572. Second Dist., Div. Six. Aug. 13, 1992.]

LEOPOLDO L. RAMOS et al., Plaintiffs and Respondents v. ANGEL ESTRADA et al., Defendants and Appellants.

**COUNSEL**

Ferguson, Case, Orr, Paterson & Cunningham, Nordman, Cormany, Hair & Compton and Glen M. Reiser for Defendants and Appellants.

Muegenburg, Norman & Dowler, Richard M. Norman and Peter O. Israel for Plaintiffs and Respondents.

## OPINION

GILBERT, J.—Defendants Tila and Angel Estrada appeal a judgment which states they breached a written corporate shareholder voting agreement. We hold that a corporate shareholders' voting agreement may be valid even though the corporation is not technically a close corporation. We affirm.

### FACTS

Plaintiffs Leopoldo Ramos et al. formed Broadcast Corporation for the purpose of obtaining a Federal Communications Commission (FCC) construction permit to build a Spanish language television station in Ventura County.

Ramos and his wife held 50 percent of Broadcast Corp. stock. The remaining 50 percent was issued in equal amounts to five other couples. The Estradas were one of the couples who purchased a 10 percent interest in Broadcast Corp. Tila Estrada became president of Broadcast Corp., sometimes known as the "Broadcast Group."

In 1986, Broadcast Corp. merged with a competing applicant group, Ventura 41 Television Associates (Ventura 41), to form Costa del Oro Television, Inc. (Television Inc.). The merger agreement authorized the issuance of 10,002 shares of Television Inc. voting stock.

Initially, Television Inc. was to issue 5,000 shares to Broadcast Corp. and 5,000 to Ventura 41. Each group would have the right to elect half of an eight-member board of directors. The two remaining outstanding shares were to be issued to Broadcast Corp. after the television station had operated at full power for six months. Television Inc.'s board would then increase to nine members, five of whom would be elected by Broadcast Corp.

The merger agreement contained restrictions on the transfer of stock and required each group to adopt internal shareholder agreements to carry out the merger agreement. With FCC approval, Broadcast Corp. and Ventura 41 modified their agreement to permit stock in Television Inc. to be issued directly to the respective owners of the merged entities instead of to the entities themselves. Ventura 41 sought this change so that Television Inc. would be treated as a Subchapter S corporation for tax purposes. In part, Broadcast Group agreed to this change in exchange for approval by Ventura 41 of the agreement at issue here, which is known as the June Broadcast Agreement. Among other things, the June Broadcast Agreement provides for block voting for directors by the Broadcast Group shareholders according to their ownership.

In January 1987, Broadcast Group executed a written shareholder agreement, known as the January Broadcast Agreement, to govern the voting and transfer of Broadcast Corp. shares in Television Inc. stock. At a later date, Broadcast Group drafted a written schedule showing the valuation of shares transferred pursuant to the January Broadcast Agreement. It set the price for purchase and sale of shares as their investment cost plus 8 percent per annum.

In June 1987, the shareholders of Broadcast Group executed a Master Shareholder Agreement. This agreement was designed to implement the Merger Agreement. It permits direct shareholder ownership of stock and governs various voting and transfer provisions. It requires that shareholder votes be made in the manner voted by the majority of the shareholders.

Members of Broadcast Group subscribed for shares of Television Inc. in their respective proportion of ownership pursuant to written subscription agreements attached to the Master Shareholder Agreement. The Ventura 41 group acted similarly.

Television Inc. issued stock to these subscribers in December 1987, and they elected an eight-member board. They also elected Leopoldo Ramos president, and Tila Estrada as one of the directors.

At a special directors' meeting held on October 8, 1988, Tila Estrada voted with the Ventura 41 group block to remove Ramos as president and to replace him with Walter Ulloa, a member of Ventura 41. She also joined Ventura 41 in voting to remove Romualdo Ochoa, a Broadcast Group member, as secretary and to replace him with herself.

Under the June Broadcast Agreement and the Merger Agreement, each of the groups were required to vote for the directors upon whom a majority of each respective group had agreed. The terms of that agreement expressly state that failure to adhere to the agreement constitutes an election by the shareholder to sell his or her shares pursuant to buy/sell provisions of the agreement. The agreement also calls for specific enforcement of such buy/sell provisions.

On October 15, 1988, the Broadcast Group noticed another meeting to decide how its members would vote their shares for directors at the annual meeting. All members attended except the Estradas. The group agreed to nominate another slate of directors which did not include either of the Estradas. The Estradas were notified of the results of this meeting.

The Estradas unilaterally declared the June Broadcast Agreement null and void as of October 15, 1988, in a letter dictated for them by Paul Zevnik, the

attorney for Ventura 41. Tila Estrada refused to recognize the October 15 vote of the majority of the Broadcast Group to replace her as a director of Television Inc. Ramos et al. sued the Estradas for breach of the June Broadcast Agreement, among other things.

The court ruled that the Estradas materially breached the valid June Broadcast Agreement, and it ordered their shares sold in accordance with the specific enforcement provisions of the June Broadcast Agreement. The court restrained the Estradas from voting their shares other than as provided in the June Broadcast Agreement.

## DISCUSSION

 The Estradas contend that the June Broadcast Agreement is void because it constitutes an expired proxy which the Estradas validly revoked.

 The interpretation of statutes and contracts is a matter of law subject to independent review by this court. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1079, 1084 [258 Cal.Rptr. 721].)

Corporations Code[1] section 178 defines a proxy to be "a written authorization signed . . . by a shareholder . . . *giving another person or persons* power to vote with respect to the shares of such shareholder." (Italics added.)

Section 7.1 of the June Broadcast Agreement details the voting arrangement among the shareholders. It states, in pertinent part: "The Stockholders agree that they shall consult with each other prior *to voting their shares* in the Company. They shall attempt in good faith to reach a consensus as to the outcome of any such vote. In the case of a vote for directors, they agree that no director shall be selected who is not acceptable to at least one member (*i.e.*, spousal unit) of each of Group A and Group B. (See ¶ 1.2(b)(1) above [which states that: 'The Stockholders shall be divided into two groups, Group "A" being composed of Leopoldo Ramos and Cecilia Morris, and Group "B" being composed of all the other Stockholders.'].) In the case of all *votes of Stockholders* they agree that, following consultation and compliance with the other provisions of this paragraph, *they will all vote their stock in the manner voted by a majority* of the Stockholders." (Second italics in original.)

 No proxies are created by this agreement. The agreement has the characteristics of a shareholders' voting agreement expressly authorized by section 706, subdivision (a) for close corporations. (See also legis. committee com., West's Ann. Corp. Code § 186 (1990) p. 52 [Deering's Ann. Corp.

---

[1] All further statutory references are to the Corporations Code unless otherwise specified.

Code, § 186 (1977) pp. 49-50], regarding proxies.) Although the articles of incorporation do not contain the talismanic statement that "This corporation is a close corporation," the arrangements of this corporation, and in particular this voting agreement, are strikingly similar to ones authorized by the code for close corporations.

Section 706, subdivision (a) states, in pertinent part: "an agreement between two or more shareholders of a close corporation, if in writing and signed by the parties thereto, may provide that in exercising any voting rights the shares held by them shall be voted as provided by the agreement, or as the parties may agree or as determined in accordance with a procedure agreed upon by them . . . ."

Here, the members of this corporation executed a written agreement providing that they shall try to reach a consensus on all votes and that they shall consult with one another and vote their own stock in accordance with the majority of the stockholders. They entered into this agreement because they "mutually desire[d]" to limit the transferability of their stock to ensure "the Company does not pass into the control of persons whose interests might be incompatible with the interests of the Company and of the Stockholders, establishing their mutual rights and obligations in the event of death, and establishing a mechanism for determining how the Stockholders' voting rights in the Company shall be exercised . . . ."

Even though this corporation does not qualify as a close corporation, this agreement is valid and binding on the Estradas. Section 706, subdivision (d) states: "This section shall not invalidate any voting or other agreement among shareholders . . . which agreement . . . is not otherwise illegal."

The legislative committee comment regarding section 706, subdivision (d) states that "[t]his subdivision is intended to preserve any agreements which would be upheld under court decisions *even though they do not comply with one or more of the requirements of this section, including voting agreements of corporations other than close corporations.*" (West's Ann. Corp. Code, § 706 (1990) p. 330, italics added.)

The California Practice Guide indicates that such "pooling" agreements are valid not only for close corporations, but also "among any number of shareholders of other corporations as well." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 1992) ¶ 3:159.2, p. 3-31.)

The Estradas cite *Dulin* v. *Pacific Wood and Coal Co.* (1894) 103 Cal. 357 [37 P. 207], and *Smith* v. *S. F. & N. P. Ry. Co.* (1897) 115 Cal. 584 [47 P.

582], as support for their argument that the agreement is an expired proxy which they revoked. Their reliance on these cases is misplaced.

In *Dulin*, defendant Clugston claimed there was an oral agreement among the shareholders that he would be president of defendant corporation and receive a salary in exchange for various loans and a mortgage to the corporation. At a later election, certain stockholders cumulated their votes and plaintiff Dulin was elected president. Clugston charged a conspiracy to defeat him.

The Supreme Court found that the alleged verbal agreement was void and that there had never been an express agreement to elect Clugston. (*Dulin* v. *Pacific Wood and Coal Co., supra*, 103 Cal. at p. 363.) No proxy had been given to vote the stock of the others involved, "nor was any required by the agreement to be given." (*Ibid.*) In short, there was no voting agreement whatsoever, oral or written which could be enforced.

The *Dulin* court never considered whether the objects of the alleged oral agreement were lawful or proper. As Marsh on California Corporation Law explains, "[t]his case would seem to hold nothing more than that the alleged agreement was unenforceable because it was oral." (3 Marsh, Cal. Corporation Law (3d ed. 1991 supp.) § 22.10, p. 1857.)

In *Smith, supra*, three individuals purchased a majority share of stock in a corporation. To keep control of the corporation, they entered into a written agreement to pool their votes so as to vote in a block for a five-year period. Although two of the three agreed on a slate for an election, the third attempted to repudiate the agreement. The two presented the vote of all the stock held by the trio in accordance with their agreement; the third attempted to vote his own stock in the manner he desired.

The court held that the express, written agreement validly called for the trio to vote their shares as a block. (*Smith* v. *S. F. & N. P. Ry. Co., supra*, 115 Cal. at p. 598.) The court viewed the agreement as a power (to vote) coupled with an interest (in purchasing stock) which was supported by consideration. (*Id.*, at p. 600.) The court construed the agreement as an agency; a proxy which could not be repudiated. (*Id.*, at pp. 598-599.)

There is dicta in *Smith* suggesting that the agreement in that case constituted an irrevocable proxy. Said the court: "It is not in violation of any rule or principle of law for stockholders, who own a majority of the stock in a corporation, to cause its affairs to be managed in such way as they may think best calculated to further the ends of the corporation, and, for this purpose,

*to appoint one or more proxies who shall vote in such a way as will carry out their plan. Nor is it against public policy for two or more stockholders to agree . . . upon the officers whom they will elect, and they may do this either by themselves, or through their proxies . . . ." (Smith v. S. F. & N. P. Ry. Co., supra, 115 Cal. at pp. 600-601, italics added.)*

The *Smith* court also held that "[a]ny plan of procedure they [stockholders] may agree upon implies a previous comparison of views, and there is nothing illegal in an agreement to be bound by the will of the majority as to the means by which the result shall be reached. If they are in accord as to the ultimate purpose, it is but reasonable that the will of the majority should prevail as to the mode by which it may be accomplished." (*Smith v. S. F. & N. P. Ry. Co., supra,* 115 Cal. at p. 601.)

In the instant case, the only difference from *Smith* is that the shareholders here chose to vote their stocks *themselves*, and not by proxy. What the *Smith* court held, however, is that voting agreements, like the one here, are valid. If the shareholders are unable to reach a consensus, then each shareholder must vote his or her shares according to the will of the majority.

The instant agreement is valid, enforceable and supported by consideration. It states, in pertinent part, that the stockholders entered into the agreement for the purposes of "limiting the transferability of . . . stock in the Company, ensuring that the Company does not pass into the control of persons whose interests might be incompatible with the interests of the Company and of the Stockholders, establishing their mutual rights and obligations in the event of death, and establishing a mechanism for determining how the Stockholders' voting rights . . . shall be exercised . . . ."

█ Section 7.2 of the agreement states that "[t]he Stockholders understand and acknowledge that the purpose of the foregoing arrangement is to preserve their relative voting power in the Company . . . . Accordingly, in the event that a Stockholder fails to abide by this arrangement for whatever reason, that failure shall constitute on [*sic*] irrevocable election by the Stockholder to sell his stock in the Company, triggering the same rights of purchase provided in Article IV above."

The agreement calls for enforcement by specific performance of its terms because the stock is not readily marketable. Section 709, subdivision (c) expressly permits enforcement of shareholder voting agreements by such equitable remedies. It states, in pertinent part: "The court may determine the person entitled to the office of director or may order a new election to be held or appointment to be made, may determine the validity, effectiveness

and construction of voting agreements . . . and the right of persons to vote and may direct such other relief as may be just and proper."

The Estradas contend that the forced sale provision is unconscionable and oppressive. They portray themselves as naive, small-town business people who were forced to sign an adhesion agreement without reviewing its contents.

Substantial evidence supports the findings that Tila Estrada has been a licensed real estate broker. She is an astute businesswoman experienced with contracts concerning real property. The consent and signatures of the Estradas to the agreement were not procured by fraud, duress or other wrongful conduct of Ramos. The Estradas read and discussed with other members of Broadcast Group, and with their own counsel, the voting, buy/sell and other provisions of the agreement and the January Broadcast Agreement, as well as various drafts of these documents, and they freely signed these agreements.

On direct examination, under Evidence Code section 776, Tila Estrada admitted she owns and operates a real estate brokerage business; she regularly reviews a broad variety of real estate documents; she and her husband own and manage investment property; and she has considered herself "to be an astute business woman" since 1985. Tila Estrada also has been a participant and owner in another application before the FCC, for an FM radio station, before the instant suit was filed.

Ms. Estrada stated she got copies "of all the drafts and all the Shareholders Agreements." She discussed these agreements with other members of Broadcast Group and with its counsel, Mr. Howard Weiss.

The June Broadcast Agreement, including its voting and buy/sell provisions, was unanimously executed after the Estradas had a full and fair opportunity to consider it in its entirety. As the trial court found, the buy out provisions at issue here are valid, favored by courts and enforceable by specific performance. (And see 3 Marsh, *supra*, at § 22.14, p. 1867; see generally *Vannucci v. Pedrini* (1932) 217 Cal. 138, 144-145 [17 P.2d 706], on the right of those who are the original incorporators to enter into a corporate agreement requiring limitations on shareholder actions so as to preserve control of the corporation as set forth in their executed agreements.)

The Estradas breached the agreement by their written repudiation of it. Their breach constituted an election to sell their Television Inc. shares in accordance with the terms of the buy/sell provisions in the agreement. This

election does not constitute a forfeiture—they violated the agreement voluntarily, aware of the consequences of their acts and they are provided full compensation, per their agreement. The judgment is affirmed. Costs to Ramos.

Stone (S. J.), P. J., and Yegan, J., concurred.

A petition for a rehearing was denied September 11, 1992, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 29, 1992.