LYMAN E. WARREN et al.

*v.*

J. HAROLD PIM et al.

[Submitted April 28th, 1903.  Decided May 30th, 1903.
Filed January 5th, 1904, as of October 19th, 1903.]

1. Notwithstanding an order making new parties complainant provides
that the right to a continuance of a temporary injunction shall depend
solely on the original complainant's right thereto, the injunction will not
be dissolved if the added complainants would have had a right to its
issuance, had they been original parties, as the original complainant's
want of equity would only affect the question of costs.

2. A shareholder's written consent, on the reorganization of a corpora-
tion, to the formation of a voting trust, prepared by the trustees and
presented to the shareholders for but ten days' consideration, accom-
panied by a threat that, unless signed, the exchange of old stock for new
would not be permitted, will be construed most strongly against the
donees of the power—the trustees.

3. The reorganization committee of an insolvent corporation, appointed
by a majority of the stockholders, who were citizens of Great Britain,
sent to such stockholders a circular-letter suggesting the formation of a
voting trust in the committee and others of its selection.   Neither the
letter nor the blank consent enclosed for the stockholder's signature sug-
gested that the trust would prevent the stockholder from directing how
his stock should be voted, or that the trust might not be revoked at pleas-
ure, nor was the duration thereof specified.   The trust agreement was

Warren v. Pim.

without consideration. On receiving the consents, the committee conveyed their shares, the legal title to which they still held, to a holding corporation, organized by them to act as trustee; the conveyance providing that the trust should endure fifty years, and giving the trustee absolute power to vote the shares as it saw fit, revocable only by three-fourths of the pooling stockholders.—*Held*, that any stockholder had the right to revoke the trust at any time, and compel a conveyance to him of his shares, and meanwhile, as a lesser remedy, to direct the voting of such shares.

4. Mere acquiescence by a shareholder in the organization and continuance of a voting trust will not impair his right to revoke it, as against trustees who are bare agents, having no interest in its continuance, and who have expended nothing nor entered into any obligation on its account.

5. The American shareholders in a New Jersey corporation agreed to a plan of reorganization, under pledge that they should have an equal footing with those in Great Britain, who constituted the majority. The directors were, and would continue to be, Americans. The foreign shareholders created a voting trust to endure for fifty years, during which the trustee was to have absolute power to vote the stock as it saw fit, subject to revocation of the trust by action of three-fourths of the pooling stockholders. The result was the control of the corporation's affairs by one-seventh of its stock.—*Held*, that the American stockholders could enjoin the carrying out of the trust; they having a right to demand the original judgment of all stockholders on the conduct of the company's affairs.

On motion to dissolve injunction. Heard on bill and affidavits and exhibits annexed thereto, and answer and affidavits and exhibits annexed thereto.

The bill, as originally framed and presented to the court, was filed by Lyman E. Warren, as sole complainant, and an injunction was granted thereon. Warren remained sole complainant until the answer thereto had been prepared and was ready to be filed. Then, and before the motion to dissolve the injunction was actually made, a motion was made, on behalf of the complainant, to amend the bill by adding the names of several other persons complainants. This was based on affidavits showing that the other persons named were interested in the same manner as was the complainant in the subject-matter of the suit. An order admitting them as complainants was thereupon made, without prejudice, however, to the right of the defendants to file the answer already prepared and move for a dissolution of the injunction on said answer and the affidavits, with leave to allow the answer to stand as the answer to the

Warren *v.* Pim.

amended bill, or to amend the same, or file a supplemental answer, in view of the amendments, at any time within sixty days from the date thereof; and that the right of the complainants to continue the injunction should depend solely upon the right of Warren to such injunction if a motion to dissolve should be made upon the answer as it already stood before the amendment. But the injunction was not to be dissolved for lack of parties, and nothing in the said order should prejudice the rights of the complainants added by this order to apply for an injunction on the bill and affidavits and any other affidavits they may present if the present injunction shall be dissolved.

*Mr. William I. Lewis,* for the motion.

*Mr. William H. Corbin* and *Mr. James M. Gifford* (of the New York bar), for the complainants.

PITNEY, V. C.

The effect of the amendment by adding additional parties, and of the terms upon which it was made, seems to me to be simply to leave the question of the dissolution of the injunction to be determined upon the situation of the cause and the allegations and proofs as they stand at the time the motion is made. For it seems to me that even if the injunction was wrongfully granted to the complainant Warren upon the bill when first presented to the court, yet, if upon the real merits of the case, the injunction would have been rightly granted if the after-named complainants had been named in the bill when first presented, it ought not now to be dissolved.

The question should be, and always, in fact, is, whether, at the time the motion to dissolve is made, the injunction ought, upon all the facts before the court, to be held and continued.

The only benefit that the defendants can derive by showing that Warren was not entitled to the original injunction would be the imposition upon him of the costs of preparing the defence as against him.

The complainants and all but one of the defendants are stock-

holders in a corporation which is one of the defendants, viz., "The Fisheries Company," a corporation of this state.

The defendants who move to dissolve the injunction are as follows: J. Harold Pim, Langley Archer West, R. Montgomery Horne-Payne and "The Association of Foreign Shareholders of the Fisheries Company of New Jersey, Limited."

The latter is a corporation formed in London for the purpose of holding shares in the Fisheries Company. The individual defendants named, Pim, West and Horne-Payne, are registered holders of a large number of shares in the Fisheries Company, constituting a majority of all the shares issued by that company, and have assigned, but have not transferred, the same to the defendant the Association of Foreign Shareholders, &c.

The three individual defendants are known throughout the case as the Pim committee.

As such they hold, as I have said, the legal title to, and are the registered owners of, a large number of shares in the Fisheries Company, but they hold them in trust for a large number of shareholders, themselves among others, and those shareholders are known in the case as the "foreign shareholders"—that is, shareholders residing in England and Ireland. The corporation known as the "Association of Foreign Shareholders" claims the right to vote on the shares so held in trust by the Pim committee, without regard to the wishes of the equitable owners of said shares.

The result of this holding is what is called a voting trust, and defendants claim that such voting trust is irrevocable and will endure as long as the "association" by its organization will endure, which is fifty years, and the avowed object of the trust is to retain for fifty years the absolute control of the Fisheries Company in the hands of the foreign stockholders. Further, by the terms of the trust, that right to vote cannot be disturbed, except by the vote of three-fourths of the stockholders, whose stock is registered in the name of the Pim committee.

The complainants are each of them the holders of registered stock in the Fisheries Company, and they are also the owners in equity of a large block of shares of stock in the Fisheries Company which they have recently purchased from persons in

Ireland, who were the equitable owners of the shares of stock standing in the name of the Pim committee.

The object of the bill is to compel the Pim committee and the "association" to transfer to them the shares of stock, the equitable title to which they are the admitted owners, which stand registered in the name of the Pim committee, or to compel the Pim committee to vote at stockholders' meetings on those shares as the complainants, the equitable owners, shall direct.

After the purchase by the complainants of the foreign shares, as just stated, they requested the Pim committee and the "association" corporation to cause the shares to be transferred to them on the books of the company, or to give them a proxy to vote the same as they should be advised, both of which requests were refused by the Pim committee and the "association." Whereupon the complainant Warren, who held the equitable title to this large block of foreign stock in trust for the other complainants, filed his bill, and an injunction was granted in accordance with his prayer. Defendants have answered. Both bill and answer are voluminous and are supported by voluminous affidavits and documentary proofs.

I shall endeavor, in giving the result of my consideration of the questions raised, to state the substance of these pleadings and exhibits with as much brevity as is practicable.

The complainants claim a double standing, so to speak, in the court—first, they are the holders of divers shares of stock standing in their names on the books of the corporation upon which they are entitled to vote, and they claim that, as such stockholders, they have a right to challenge the legality of the voting trust created and attempted to be upheld by the defendants.

In the second place, they are the holders of the equitable title, manifested in a manner which I shall state presently, of a large block of shares, as we have seen, the legal title to which is held by the Pim committee and the "association;" and they claim the right, notwithstanding the voting trust, to have those shares transferred to them on the books of the Fisheries Company, and to exercise their right to vote upon the same.

In one aspect of the case, then, it resembles *White* v. *Thomas*

*Inflatable Tire Co., 7 Dick. Ch. Rep. 178 (1893)*, and *Kreissl v. Distilling Co., 16 Dick. Ch. Rep. 5 (1900)*. In another aspect it resembles *Cone* v. *Russell, 3 Dick. Ch. Rep. 208 (1891)*, and *Chapman* v. *Bates, 15 Dick. Ch. Rep. 17; S. C. on appeal, 16 Dick. Ch. Rep. 658 (1900)*.

In the first two cases named the complainants were stockholders who had not united in any voting trust. In the last two cases the complainants were stockholders who had united in a voting trust and had given proxies or powers of attorney irrevocable for a period of years.

The Fisheries Company is the successor of a corporation known as the American Fisheries Company (called in the case the old company), which was organized in 1898, and was wound up in insolvency by this court in the spring of 1900. It was composed of a large number of British and American stockholders, the British stockholders being in the majority and quite numerous and widely scattered. The immediate cause of its insolvency in the beginning of 1900 was that it had been badly managed and had had a year or two of bad fishing.

It had two kinds of stockholders, preferred and common, and, by a by-law, no mortgage could be put on the property of the company without the consent of every preferred stockholder. Hence it was unable to raise the small sum of $200,000, which it needed to meet present liabilities, and was obliged to go into insolvency.

As soon, however, as receivers were appointed, efforts were made to reorganize the company, and were carried through with great industry, so that it was reorganized some time in June or July of the same year, and the Fisheries Company, or, as it is called in the case, the new company, was formed, with some little additional capital added, and each stockholder of the old company had a fair and full opportunity to come into the new company, and did come in and receive stock for his old stock upon subscribing and paying for an issue of mortgage bonds which were necessary to put the company on its feet. Since that time it has earned more than its expenses and paid one dividend.

A part of the process of winding up of the old company was

the forming of a plan of reorganization, which was reduced to writing and agreed to by a committee of the creditors and a committee of the stockholders, and made a *quasi* record of the court, and was faithfully carried out.

The British stockholders, having a majority of the stock, were authorized themselves first to carry out the reorganization. If they failed to do it within a certain time, then the American stockholders were given the privilege, and, if neither did, then the assets were to be sold and divided among the original stockholders after paying the debts. That the assets were quite sufficient to pay the debts several times over abundantly appeared.

In order to carry out the reorganization the foreign stockholders were called together, by some of the principal stockholders, and a meeting was held in Dublin, at which a committee (Messrs. Pim, West and Horne-Payne) was appointed to carry out the reorganization. They gathered together the certificates of stock held in the old company, got into correspondence with all the stockholders and procured from them the new subscriptions. For the sake of convenience, when the new company was organized and shares of stock issued, those of the foreign stockholders were issued in a block to the Pim committee, and by that mode they became the registered holders.

The foreign subscribers to the new company never had a single certificate issued to them as such.

The American stockholders did the same thing, without the intervention of a committee, and subscribed and became the holders of just a little less than one-half of the new preferred stock, leaving the British stockholders the owners of a trifle more than one-half of it. A large amount of common stock was issued, of little value, costing the subscribers $5 a share, and of this much the larger portion was taken by the foreign stockholders. So that, counting the common stock, they had a large majority. The reorganization was effected during the months of April, May and June, 1900.

Several circular-letters were written by the Pim committee to the foreign stockholders, stating the plan of reorganization and naming a time within which they must subscribe and pay their money. That time was first fixed for the 1st of June, 1900.

The time, by the plan of organization, given to the foreign stock-holders to organize was until the 15th of June, but the Pim committee were quite justified in fixing the time for the 1st of June, so as to enable them to collect the funds and transmit them to the United States before the 15th.

During the month of May the idea suggested itself to the Pim committee that the control of the company should be kept by the foreign stockholders, and with that view they conceived the idea of a voting trust, and on the 1st of June, 1900, they sent out a circular-letter to the foreign stockholders suggesting that idea. In that letter they stated to the shareholders in the old company and the proposed subscribers to the new the progress which had been made in the United States in taking up pre-ferred and ordinary shares, and then add this clause:

"We have come to the conclusion, after long and careful consultations with large shareholders, that the only effective way of securing control of the new company to the shareholders in the United Kingdom is by the establishment of a 'voting trust,' that is to say, the trust shall hold as if it were the absolute owner and holder of shares in the new company belonging to persons resident in the United Kingdom, and these persons shall accept the certificates of the trust, which will carry all rights and benefits except that of voting. By this means a solid controlling vote will be secured upon all important questions at the company's meetings in America, which would not be the case if the voting was left to the individual shareholders. We propose that the members of the trust should be, in addition to ourselves, four large shareholders, to be hereafter selected by us.

"By the order of the court, the time for reorganizing will expire on the 15th inst., so that we have very little time for completion of our arrange-ments. Be good enough, therefore, to sign and return to us at once, but in any case not later than the 11th inst., the enclosed slip approving for the formation of the voting trust. *Unless we receive this approval, we shall reserve the right to return the subscription to any dissentient sub-scriber.*

"This voting trust will, of course, affect the shares only, and not the bonds, which will be delivered to the subscribers in due course. As there now seems to be so good a prospect for the reorganization, the committee are anxious that those shareholders who have not already sent in their applications should have another opportunity of doing so, and they have, therefore, decided to extend the time for making the applications until the 11th inst., but shareholders must distinctly understand that after this date the right to apply will be absolutely lost. *Any such applications must be accompanied by the formal assent to the voting trust.*"

Warren v. Pim.

With that letter went a printed authorization in blank to be .signed by the subscriber, in the following language:

> "I agree that the shares in the new company to which I may be entitled shall be held by a voting trust to be constituted as described in your ·circular letter of the 1st June, 1900, and I request you to procure such a trust to be constituted.
>
>        "Ordinary signature .................................
>        "Name in full........................................
>        "Address in full.....................................
>        "Description ........................................
>              "Date................1900.
>
> ·"To Messrs. J. Harold Pim, Langley A. West and R. M. Horne-Payne, Shareholders' Committee of American Fisheries Company in [Liquidation]."

It will be observed that nothing is said in the letter or con-.sent as to the length of time the voting trust shall last, or as to the right of the person consenting to enter it to revoke his .grant; and further, that it contains a threat that, unless the voting trust was acquiesced in, the subscriber would not get · any benefit whatever in the new company, and, as a necessary result, would lose all his holdings in the old company.

Further, the trust was naturally and necessarily confined to ·the foreign stockholders, for the avowed purpose of perpetuating in them the control of the company.

In the latter part of April and the first part of May, and while this general plan of a voting trust was under consideration, the complainant Warren, who is a member of the New York bar, was in London and Dublin assisting and advising ·the foreign stockholders' and the Pim committee in promoting the plan of reorganization, and was aware that the formation ·of a voting trust was contemplated, and, to some extent, advised the Pim committee therein; but then, or later on, he distinctly .advised them that it would be bad policy to permit the American stockholders to know of the proposed plan, and, in point of fact, none of them but Warren did know of it until long after ·it was formed.

Almost all the foreign shareholders, including those under whom the complainants claim, signed the authorization above

set forth and returned it to the Pim committee, and that is· all the authority they ever had for the forming of the voting· trust.

The process of collecting in and forwarding to the United· States the moneys subscribed by the foreign stockholders occupied several months, and in the meantime the Pim committee· were engaged in devising and putting in shape ·the proposed voting trust. .For that purpose they organized, under the British statutes, a corporation by the name of "The Association of· Foreign Shareholders of the Fisheries Company of New Jersey, Limited," and procured its incorporation on the 5th of November, 1900. The incorporators were the three members of the Pim committee and four other stockholders in the new company,· to wit, Francis Bellingham Jameson, of London; Frederick John Yarrow, of London, and Samuel Smith McCormick and Thomas Falls, of Dublin. The association was absolutely without any capital or any shares of stock.

The articles of association mentioned several objects of the· corporation, the first of which was this:

"(1) To undertake and execute trusts of all kinds, and in particular to· concur in the execution of a deed poll constituting a trust of shares in the Fisheries Company of New Jersey, and framed in accordance with the draft which for the purpose of identification has been subscribed by the· first three subscribers hereto."

The membership was limited to twenty, but the seven sub-· scribers were declared to be the first members and the first committee, with power to determine the terms and conditions upon which subsequent members shall, from time to time, be·· admitted; and that a party may cease to be a member by resignation or as the effect of a request to resign by a resolution of the committee. The members could vote by proxy, and the committee was composed of the seven persons signing the · articles of association, and each member of the committee was· continued in office until he became a bankrupt, "or suspends payment, or compounds with his creditors, or is found a lunatic and becomes of unsound mind, or when he resigns or is removed· by resolution of the committee." There are many other pro-··

Warren *v.* Pim.

visions in the articles of association, but they manifest no sort of business which the association propose to pursue other than that first stated, viz., the general business of being a trustee.

On the 12th of November, 1900, a week after the organization of the association was completed, a sealed instrument, called in the case the "deed poll," was executed by the association and by Pim, West and Horne-Payne, members of the committee. That deed poll refers to the circular-letter, hereinbefore mentioned, of June 1st, 1900; the assent to the plan of creating a voting trust, signed by members of the shareholders, and that the Pim committee had become the holders of the majority of the shares in the new company of New Jersey, and recites:

"Whereas, the association is the said proposed voting trust, and has been formed pursuant to the said circular, and the said Pim, West, Horne-Payne and four other shareholders selected by them, viz.: Falls, Jameson, McCormick and Yarrow."

It then declares

"That the persons who brought their shares in the old company to the Pim committee and signed the assent to a voting trust are to be called the 'depositors,' and the shares brought in are to be called 'deposited shares,' and the owner of the deposited share means the equitable owner for the time being of a deposited share, in accordance with the provisions therein contained; that the shares in the Fisheries Company now held by the Pim committee, and any further shares of the company which shall be vested in the association, shall be held by the association, with all rights and powers against third persons as if it were the absolute owner and holder thereof as between the association and the owners of the deposited shares.

"The certificates of the association issued to such owners shall carry all · rights and benefits, except that of voting, subject to the provisions thereof; and such vesting may be, when the association thinks fit, made by a declaration of trust in favor of the association, and when the shares are so vested the association may allow the legal title to remain outstanding · so long as the association thinks expedient.

"Every owner of a deposited share will be entitled to a certificate, under the seal of the association, called a 'share trust certificate,' and stating the number of shares, &c., and giving the form of the certificate to be issued by the association. [And I stop here to say that the title to the shares purchased by the complainants from the foreign shareholders is manifested by a share trust certificate.] Further, that the association will recognize the registered owner of any deposited share as the absolute equitable owner thereof, subject to these presents; and every owner of such deposited share entitled to transfer the same by an instrument in the usual form."

Afterwards comes a declaration of the trust upon which the shares are held:

"The deposited shares shall be held by the association upon trust that they may and shall according to the best of their discretion do the things following, that is to say:

"(1) Exercise all voting rights incident to the ownership of shares as and when the association shall think it expedient to exercise the same.

"(2) Receive all dividends and bonuses and other moneys receivable in respect of the deposited shares.

"(3) Raise or borrow on the security of the deposited shares any money required for the purposes of the execution of the trust.

"(4) Take all such actions and proceedings as they think expedient from time to time to protect the interests of the owners of the deposited shares."

Then further on follows a provision stating the duration of the trust:

"The trust shall be closed when one of the events following shall happen, that is to say—

"(1) When and so soon as the association by deed declare that it is to be closed; or

"(2) When the owners of three-fourths of the deposited shares of each class by notice in writing to the association declare the trust to be closed; or

"(3) When the last survivor of the now existing descendants of Her Majesty shall have been dead for twenty years; or

"(4) When fifty years from the execution hereof shall have elapsed."

Then follows, among others, a provision giving the association power to make an assessment upon the owners of the shares to pay the expenses of the association.

After the formation of this trust and the execution of the deed pool, which was not, of course, recorded in any public place, copies thereof were printed in handsome style and sent out to some of the larger stockholders, and a circular-letter was sent to all the stockholders calling their attention to the formation of the trust and the deed poll, and that:

"A copy of the memorandum and articles of the association, and of the trust deed above referred to, may be inspected at the office of Messrs. Stokes Bros. and Pim, above mentioned, or at the office of Messrs. Morley, Shirreff & Co., 53 Gresham House, Old Broad street, London, or copies of these documents can be obtained on application to them, and on payment of a fee of 1s. for each copy."

That circular was the first notice, so far as appears, that any of the foreign shareholders had of the actual terms of the trust, and its terms were not brought to the notice of any of the complainants, except Warren, until some time later.

The result of this instrument construed, as it must be, in connection with the articles of association of the "association," was to vest in the individual defendants the absolute and irrevocable power, for fifty years, to control and manage the affairs of the Fisheries Company. They thereby have the right to name their own successors, and, by transferring a few shares to mere dummies, having the necessary residential qualifications, may fill the board of directors with their mere creatures, destitute of the least pecuniary interest or responsibility in the corporation. This they have already done to the extent of two directors.

I will stop here to say that a great part of the answer and affidavits is aimed at the peculiar position occupied by Mr. Warren, as having been counsel for the Pim committee and as having advised them, from time to time, in regard to the voting trust, and generally having occupied confidential relations toward them. And it is charged that his conduct in going abroad, as he did, in the fall of 1902, and purchasing these association certificates from the foreign stockholders, and now filing this bill for the purpose of what is called breaking the trust, is unprofessional and inequitable, and deprives him of any aid from a court of equity. I do not deem it at all necessary to go into the details of the proofs on this subject, and content myself with saying that I do not agree that the case shows anything that places Mr. Warren in the position of having been guilty of unprofessional conduct or a breach of professional confidence. The fact is that he was employed by the other complainants herein and furnished with money to go abroad, in the fall of 1902, for the purpose of purchasing such a block of foreign stock as would give the American shareholders, if they all combined, a majority of the stock. It does not appear that, in the course of such employment, he made the least use of any information which he obtained as confidential counsel of the defendants. He performed that task, and took title to

the association certificates in his own name and filed a bill in his own name. That was probably a mistake in practice which might—I do not say would—have rendered his bill defective for want of parties, on the ground that the real parties in interest should have appeared on the record. But whether a fatal defect or not, it was cured by the amendment which brought in the real persons parties in interest as complainants. Not one of them had any notice of the voting trust until long after it was formed, and not one of them had done any act of even simple acquiescence therein, much less have they done any act upon which any estoppel in favor of the defendants can be based.

This brings us to the merits of the real question in the case, and that is:

*First.* Have the American stockholders, by virtue of their ownership of stock to which they originally subscribed or purchased from original subscribers, standing in their names on the books of the company, a standing in this court to complain of the exercise of the right of the Pim committee or the association to vote upon the shares held by them in trust, irrespective of the wishes of the *cestuis que. trustent?*

*Second.* Have the complainants, as owners of the equitable title of a certain number of shares, the title to which stands in the name of the Pim committee on the books of the corporation, the right, as assignees of the original holders of certificates of deposited shares, to revoke the consent given by those original holders to the Pim committee to form the voting trust, and to be accorded by this court the right to control the vote on those shares?

In the first place, it is proper to observe that it was quite natural and proper and entirely lawful that the foreign stockholders, who were numerous, should combine to enable themselves to vote upon their stock at any meeting of stockholders in the far away State of New Jersey. That combination might be either by a proxy or by the formation of a voting trust. In principle I see little difference between the giving of a proxy to vote and the transfer of shares of stock to a trustee to vote in person or by proxy. The principle is the same. In either

4

case the holder of the stock is exercising his right to have his voice heard in the way provided by law in the management of the corporation in which he is a stockholder. So far, the circular-letter of June 1st, 1900, addressed to the stockholders by the Pim committee, suggests nothing illegal or improper. Whether the further object mentioned in that letter, viz., that the foreign stockholders should, by combination, control the new company, was lawful, is another question. And, as before remarked, nothing in that letter suggests that the creating of the voting trust would, or could, stifle the voice of the equitable owner and prevent him from directing the legal owner as to how he should vote on his stock. Nor did it suggest that, by consenting to the creating of the voting trust, the equitable owner deprived himself of the right to revoke the trust at his pleasure.

The consent paper was, as we have seen, prepared by the committee, and was presented to the stockholder and his signature demanded within a period so short as to well-nigh preclude proper consideration on his part as to its practical working and effect; and such presentation was accompanied with a threat that, unless immediately signed, the helpless stockholder would lose his all. Under such circumstances the court should construe it most strongly against the donee of the power, and, so far as possible, avoid drawing any inferences unfavorable to the original and natural rights of the donor..

It is next to be observed that no consideration whatever was paid, directly or indirectly, by the Pim committee, or trustee, to the owner for his consent to the voting trust. It was a purely voluntary creation of power. The transaction did not even contain the element of mutual promise, such as has arisen and been dealt with by the courts, where several persons have united and, by agreement, have purchased, in their joint names and out of the aggregate of their individual means, a block of shares of stock, upon the agreement and undertsanding between them that they were to be held as a solid block and voted as a majority of the pool should determine. There a consideration—whether a sufficient consideration or not has been considered a debatable question—is found in the mutual contribution of

funds to the joint purchase and the mutual promise to act in concert as a majority of the contracting parties should determine. I repeat, there is no such element found in the present case.

Again, it is to be observed that the length of time the trust was to continue was not mentioned in the circular-letter of June 1st or in the acceptance thereof signed by the depositing stockholder. There was nothing to lead the stockholder to believe or infer that the deputation of the right to vote was to be perpetual, or substantially so, and so the question at once would arise, what would be the reasonable construction to put upon such consent or deputation. By our statute the time to which an ordinary proxy is limited is three years, and even then the proxy is revocable at the pleasure of the donor. That I conceive to be a statutory declaration of policy on that subject. Be that as it may, I find nothing in the documents just mentioned to authorize or warrant the assumption of the power by the members of the Pim committee, after organizing the corporation in question, which of itself was innocent enough, to convey to that corporation all the shares of stock held by them, and to annex to them a power of voting, for fifty years, without regard to the wishes of the individual owners, or even a bare majority of them, and without allowing to them the power of revocation, except by the owners of three-fourths of the shares deposited.

It follows that the signing of the consent to the formation of the voting trust amounts to no more than the appointment of the holder of the legal title as the agent of the equitable owner, with power only to vote upon the stock as he, the equitable owner, should direct, and, in the absence of special direction, as the agent should see fit, and subject to the duty to vest the legal title in the equitable owner whenever demanded. It gave the legal owner no interest whatever in the stock or any other power over it.

It is, however, alleged, and is a part of the defence, that the certificate-holders who transferred their certificates to the complainant Warren had notice and knowledge of the deed poll and the terms thereof, and acquiesced therein long be-

fore they transferred the certificates to him. There is some conflict in the proofs on this subject, but I shall assume that, for the present purposes, the weight of the evidence is that such certificate-holders did acquiesce in the deed poll in so far that they did not protest against it and did not take any legal measures to revoke or set the same aside or otherwise disturb its force and effect. Granting all that, I am unable to see how it varies the position of the parties. Such acquiescence and failure to protest and take legal measures cannot injure the equitable standing of the shareholder, unless the defendants have acted thereon in such manner that they cannot be restored to their original position, or, in other words, unless there are some facts raising an estoppel, such as existed in the case of *Chapman* v. *Bates,* above cited. The defendants have expended no money, except what they have been reimbursed; they have entered into no obligations; they will suffer no loss, directly or indirectly, by what has been called the breaking of the trust. Hence it does not lie in their mouth to set up acquiescence. They are bare trustees or agents, without any interest in perpetuating the trust, and cannot complain of its revocation.

And looking at the affair in its general aspect, and without regard to what may be termed the special views of the law as applied to transactions of this particular kind, I cannot avoid thinking that it somewhat resembles a voluntary family settlement or deed of gift, without consideration, and not acted upon so as to render its revocation in any degree inequitable or unjust, but in the framing of which a distinct power of revocation has not been reserved. As to such instruments, it is perfectly well settled that they are revocable at the will of the settler. *Garnsey* v. *Mundy, 9 C. E. Gr. 243,* is a leader of quite a long line of cases in this state on that subject.

I conclude, then, that, upon general principles, the holders of the certificates who assented to the creation of the voting trust had the right, at their pleasure, to revoke the same, and to demand from the defendants the transfer to them as individuals on the books of the company of the shares of stock which they had deposited with the defendants, and also, as a

lesser remedy, the right to dictate to the defendants how they should vote on those shares before that transfer.

Turning to the law applicable to this case, it seems to be pretty well settled in this state by quite a long line of decisions. Voting trusts are not declared to be necessarily unlawful; they may or may not be lawful, according to the circumstances of the case. The general rule is that, *prima facie*, they are unlawful, but may be rendered lawful by the circumstances. The leading case is the famous one in the law courts of *Taylor* v. *Griswold, 2 Gr. 222.* In this court we have the cases above cited, three of which happen to have been dealt with by me, and in each of which I had the aid of able and distinguished counsel. The last one, *Chapman* v. *Bates,* was considered by the court of errors and appeals, and that court, in its opinion in affirming the decree below, expressly recognized the correctness of the principles attempted to be laid down in *Cone* v. *Russell* and *White* v. *Thomas Tire Co.,* and treats of the principle upon which voting trusts may be maintained and in what cases a power of attorney to vote (which I assume to be precisely the same thing) may be irrevocable. At the top of *p. 665, 16 Dick. Ch. Rep.,* Mr. Justice Garretson, speaking for that court, uses the following language:

"A power of attorney may become irrevocable whenever the object is to create an interest; and this is so even if it is not stated in the instrument itself to be irrevocable. While the general rule is that a principal may revoke the authority of his agent at his mere pleasure, an exception to this rule is when the principal has expressly stipulated that the authority shall be irrevocable and the agent has an interest in its execution. *Story Ag. 476.* But where an authority or power is coupled with an interest, or where it is given for a valuable consideration, or where it is part of a security, there, unless there is an expressed stipulation that it shall be revocable, it is, from its very nature and character, in contemplation of the law, irrevocable, whether it is expressed to be so upon the face of the instrument conferring the authority or not. *Story Ag. 477; Hunt* v. *Ronsmanier, 8 Wheat. 174; Durbrow* v. *Eppens, 36*

*Vr. 10.* In this last case illustrations of irrevocable power of attorney can be found."

After *Chapman* v. *Bates* had been decided in this court, and before its decision on appeal, the whole subject came before Chancellor Magie, in the case of *Kreissl* v. *Distilling Co. of America, 16 Dick. Ch. Rep. 5,* and he there reviews the previous cases and the principles established. In that case the complainant had not pooled his stock, but, by his bill, asked that the trust or committee should be restrained from exercising the power given it by the stockholders who had pooled their stock. At pages 14 and 15 he uses the following language:

"The power of revocation is deemed sufficient to protect the rights of other stockholders. If, however, the stockholder undertakes to make irrevocable his grant of power and to denude himself for a fixed period of the power to judge and determine and vote as to the proper management and control of the affairs of the corporation, then whether the grant of power is good or not must depend on the purposes for which it is given.

"When the scheme devised does not embrace a grant of irrevocable powers by proxy, but seeks a similar object by the creation of a trust and the appointment of a trustee, to whom the title of the stock is conveyed; a like doctrine must be applied. *If no provision is made for the conduct of the trustee, at least he would be bound to vote on the stock held in trust in accordance with the expressed wishes of the cestui que trust;* but if the transfer of the legal title to the stock is made and accepted under an agreement of the stockholder which deprives him of all power to direct the trustee, and all opportunity to exercise his own judgment in respect to the management of the affairs of the corporation, then *whether the transaction is open to the objection of other stockholders, as depriving them of the right they have to the aid of their co-stockholders, must be dependent upon the purposes for which the trust was created and the powers that were conferred.*

"If stockholders, upon consideration, determine and adjudge that a certain plan for conducting and managing the affairs of the corporation is judicious and advisable, I have no doubt that they may, by powers of attorney, or the creation of a trust,

or the conveyance to a trustee of their stock, so combine or pool their stock as to provide for the carrying out of the plan so determined upon. *But if stockholders combine by either mode to entrust and confide to others the formulation and execution of a plan for the management of the affairs of the corporation, and exclude themselves, by acts made and. attempted to be made irrevocable for a fixed period, from the exercise of judgment thereon,* or if they reserve to themselves any benefit to be derived from such a plan, to the exclusion of other stockholders who do not come into the combination, then, in my judgment, such combination and the acts done to effectuate it are contrary to public policy, and other stockholders have a right to the interposition of a court of equity to prevent its being put into operation."

The words I have italicized apply to the present case, except that the majority stockholders in this case have not even formulated a plan for the management of the affairs of the corporation, but have left that entirely to others, and have excluded themselves from the management, and have attempted to make their action in that respect irrevocable for a fixed period, and so to exclude themselves from the exercise of their judgment on the affairs of the corporation, or, rather, the defendants, the Pim committee, have assumed, without authority of the stockholders, to place the stockholders in that position.

But let us look at the circumstances of the present case from a purely practical point of view. The Fisheries Company is a corporation of the State of New Jersey, doing business wholly upon the coast of the United States; its nominal headquarters is in New Jersey. The principal location of its business is Tiverton, Rhode Island, where it has a factory for extracting the oil from fish which it catches and converting the residue into fertilizers. The American stockholders protected their rights in the old company by taking stock in the new company upon the express agreement that they should stand on an equal footing with the foreign stockholders. Such was the terms of the plan of reorganization, previously referred to, and under which the new company was actually organized. They knew that the majority of the stock was held abroad. and that the

management of the company was subject to the criticism of
the foreign stockholders. So far, then, as any questions might
arise as to the management of the company, it was of the utmost
importance to the American stockholders that the merits of the
management should be subjected to the test of the judgment
of all the stockholders. The first set of directors, by common
consent, were constituted entirely of citizens of the United
States, and, as a matter of practice, that must continue to
be so. Hence those directors and the American stockholders
who may have voted for them had a peculiar right in this case
to depend upon submitting the propriety of their management
to the individual judgments of the foreign stockholders. They
had a right to rely upon the law, as settled by the courts of
this state, to protect them therein. They might reach those
foreign stockholders either by personal interview or by circulars
discussing the condition and management of the affairs of the
corporation, and they had the right, by that law, to have the
judgment thereon of those individual stockholders freely and
fairly exercised in the votes which they might cast for directors
at the annual elections. Instead of that, they find all the
foreign stock pooled in the hands of seven men, who exercise
complete control over the affairs of the company and have the
right to perpetuate themselves for fifty years by their power
of reappointment, and they cannot be dislodged from their
position without the concurrence of seventy-five per cent. of
that stock which is controlled by the pool. As that amounts
to about three-fifths of the whole, it reduces the amount neces-
sary to maintain the Pim committee and their associates in
power to one-quarter of two-fifths, which is about one-seventh
of all the stockholders.

Now, it seems to me that the American stockholders, who
are registered as such, have a right to complain of that state
of affairs. It deprives them of the benefit of the judgment of
about one-half of the stockholders of the company, and, as
before remarked, brings the case far within the ruling and
decision of the chancellor in the case of *Kreissl* v. *Distilling
Co. of America.*

I have looked at some of the cases adjudged by the courts of

other states and relied upon by the defendants' counsel. Many of them are cited by the supreme court of California, in *Smith* v. *San Francisco and North Pacific Railway Co., 115 Cal. 584;* also reported in *35 L. R. A. 309.* In that case the decision of the court below was reversed by the court of appeals, with the chief-justice dissenting, so that the decision is a result of a divided court. So far as it applies here, it was an affirmation of the doctrine that where three men unite and provide funds to purchase a block of stock and agree that the stock shall be voted as they, or a majority of them, shall determine, the mutual promise is a consideration for the contract. But a careful consideration of the learned opinion in that case shows that the present case is excepted. At *p. 317, L. R. A.,* first column, the learned judge says this:

"The question has been presented in cases of voting trusts, but an examination of these cases will show that the question has arisen either when the authority was expressly given to carry out some illegal purpose, *or when having been given without any consideration, though purporting to be for a definite term, subsequent owners of the stock have sought to revoke it before the expiration of the term.*"

He thus expressly excepts the present case.

Another case relied on by the defendants is *Brightman* v. *Bates, 175 Mass. 105 (1900).* That was an action by a broker, or person acting as such, for compensation according to contract, for services rendered in forming a voting pool of stock in a corporation. The defence was that the pooling contract was, on its face, unlawful to the knowledge of the plaintiff, and therefore he was not entitled to compensation.

It will be seen that a very clear case of an absolutely unlawful combination was necessary in order to maintain the defence. Besides, I infer from the statement of the case that there was a consideration for the contract, as between the several stockholders, who were the defendants, which rendered it binding as between them—following the doctrine laid down in the California case just cited. Be that as it may, the pooling contract disclosed no unlawful object, and the length of time it should endure—three years—was quite reasonable. The ques-

tion whether it was revocable during that period was not involved nor discussed, and the language of Chief-Justice Holmes, who delivered the opinion and upon whose language the defendants rely, must be construed accordingly.

Other cases cited by the defendants are clearly distinguishable from the present.

But whatever judicial expressions or decisions, if any, may be found in other jurisdictions not consonant with the clear line of well-established authority in this state, must be disregarded by me, for the simple reason that the parties hereto are stockholders in a New Jersey corporation, governed in their relations and rights, so far as relates to the matters here involved, by the law established by the legislature and declared by the courts of this state.

The complainants, in becoming stockholders in the corporation, were entitled to rely upon that law, and the defendants and those whom they represent acquired their stock subject to the same law, and must be content to be bound thereby.

Chancellor Magie, in the case of *Kreissl v. Distilling Co., supra*, cited, with approval, the previous decisions of this court, and formulated the doctrine to be deduced therefrom in the language above quoted, and granted an injunction against a voting pool in that case, depriving the members of the right to vote on the stock held by them, using this language:

"While I would entertain no doubt that the gentlemen composing these trustees would not take advantage of withdrawing stockholders, and execute a plan they disapprove of, the fact that they are given express power to do so, and the power to elect the board of directors to co-operate with them, deprives the transaction of any tentative character, and justifies its being pronounced contrary to public policy, in that it provides for a possible management of the affairs of the company, during a fixed period of time, by the judgment and determination of others, and not by the judgment and determination of complainant's associates in this corporation."

His decision in that case binds me, even if I disagreed with him, which I do not.

The general doctrine, stated by him, as derived from the previous cases as forming the basis of his decision were expressly approved by the court of errors and appeals in *Chapman* v. *Bates*. So that, though the result, owing to the circumstances, was different in *Chapman* v. *Bates,* there is not the least conflict between the final decision in that case and that of Chancellor Magie in the case before him.

It may not be out of place to say that a copy of Chancellor's Magie's opinion was promptly forwarded by Mr. Warren to the solicitors of the defendants in London.

Upon the whole case, then, I conclude that the complainants are entitled to succeed on both grounds put forward by their counsel, viz.: *First.* That the creation of the pool, with its ironclad provisions and without the knowledge or consent of complainants, gave the defendants, as holders of the foreign stock, an unfair and an unjust advantage, in that it deprived the complainants of the right to appeal to, and have the benefit of, the individual judgments of the foreign stockholders upon any and all matters connected with the policy or management of the corporation. *Second.* That the equitable owners of the shares (the legal title to which was held by the defendants) from whom the complainants derived equitable title to those shares had the right, by the law of this state, to revoke the self-assumed authority of the defendants and to compel the latter to transfer the legal title to them as equitable owners, and that such right passed with the equitable title to the complainants, who are entitled to enforce the same in this court.

I will advise a decree that the motion to dissolve be denied, but, as the complainants amended after the defendants had prepared their answer, without costs.