## ENGLISH et al. v. ROSENKRANTZ.

1. An agreement between members of one faction holding a majority of the capital stock of a private corporation organized under the provisions of the Civil Code, § 2823, whereby such members relinquish their right individually to vote their stock in the corporation according to the judgment of each individual, and contract that the voting power shall rest unqualifiedly and absolutely in one of such members, to the exclusion of the others, for a long period of time, and that during such time certain of the members shall hold salaried offices whether or not it be for the best interest of the corporation and all its stockholders that the persons designated as officers should be elected and kept in office, or that the specified salaries be paid, and whereby persons holding a minority of the stock of the corporation, who are not parties to the agreement, may be excluded from participating in the management and control of the corporation, or holding any of such salaried offices during the term of the agreement, is against public policy and therefore void. Applying the principle stated, it was error to overrule the demurrer to the petition as amended.

2. The assignment of error in the cross-bill of exceptions is without merit.

No. 2486. FEBRUARY 18, 1922.

Certiorari; from Court of Appeals. 26 *Ga. App.* 234.

On the 16th day of April, 1918, Mrs. Rebie Rosenkrantz instituted an action against James W. English Sr., Harry L. English individually and as administrator of the estate of James W. English Jr., deceased, James D. Robinson, Emily English Robinson, Jennie English Kiser, and John K. Ottley. The action was to recover damages for an alleged breach of contract. The defendants filed general and special demurrers to the petition. Certain amendments to the petition were allowed, after which the demurrers were renewed. The court sustained a special demurrer to paragraph ten, and, with that paragraph stricken from the petition, overruled the demurrers upon all other grounds. The defendants excepted to so much of the judgment as overruled the demurrers; and the plaintiff filed a cross-bill of exceptions, assigning error on that part of the judgment which struck paragraph ten of the petition. On review the Court of Appeals affirmed the judgment of the trial court on both bills of exceptions. The case comes to the Supreme Court by writ of certiorari, assigning error on the judgment rendered by the Court of Appeals.

It is to be gathered from the allegations of the petition as amended, that James W. English Sr. was the father of each of the other defendants, except James D. Robinson who was his son-in-

law, and John K. Ottley who was his close associate in business. The opinion of the Court of Appeals contains a statement of the substance of the petition and demurrers, which, with some change of expression and a substitution of a copy of the contract alleged to have been breached in lieu of a statement of its contents, is as follows: In the year 1885 petitioner's father, W. B. Lowe Sr., associated with defendant James W. English Sr. and others, organized the Chattahoochee Brick Company, a corporation engaged in general contract work and the manufacture and sale of brick. Its capital stock was 2000 shares ($200,000) of a par value of $100 each. W. B. Lowe Sr. died in 1900, leaving a will, and at the time of his death the stock was held as follows: The Lowe estate 807 shares, James W. English Sr. 813 shares, A. B. Steele 380 shares. The Lowe estate was controlled by the executors appointed in the will, namely his widow Rebecca D. Lowe, his son W. B. Lowe Jr., and the petitioner. The petitioner had intermarried with James W. English Jr., a son of James W. English Sr., in 1896, and at the time of the death of W. B. Lowe Sr. petitioner was the daughter-in-law of James W. English Sr., her married name being Rebie Lowe English. She and her coexecutors differed as to the voting of the Lowe stock. The other two were opposed to the management of the company by the Englishes, and were unwilling to re-elect James W. English Sr. as its president. Petitioner offered to vote one third of the Lowe stock for him, but was advised that she could not, and that the other executors, being a majority, could vote the stock. The Lowe stock with Steele's stock was a clear majority. Steele encouraged Mrs. Lowe to stand for the office of president, and she was favorably considering the suggestion. In such circumstances the petitioner's then husband, James W. English Jr., had an interview with Steele and made a contract in the name of James W. English Sr. to purchase the Steele stock. This was done in pursuance of an agreement between James W. English Sr. and James W. English Jr., that the purchase should be in the senior's name, but that petitioner should receive one third of the Steele shares, James W. English Jr. one third and James W. English Sr. one third. Petitioner's attitute had estranged her from her own family, and her relations with her husband's family were then close and friendly. After the purchase James W. English Sr.

refused to recognize the agreement mentioned above, and insisted on having for himself 220 shares of the stock acquired from Steele. This would give him 1033 shares, being a majority of the total stock of the corporation in his own name. Of the remaining 160 shares the petitioner was allotted 80, and James W. English Jr. 80. James W. English Jr., for himself and for his wife, the petitioner, protested against this arrangement, but their consent was finally obtained upon an agreement that the parties should enter into a contract which would fix the rights of the parties and protect them against the power of the majority of the stock, which thus went to James W. English Sr. Under such circumstances James W. English Jr. and petitioner entered into the contract which will presently be stated. After so obtaining such majority of the stock, James W. English Sr., for reasons of his own, caused seven shares of his total of 1033 shares to be apportioned, one share each among members of his family, and one share to John K. Ottley. The names of the persons taking under such apportionment appear in the contract hereinafter set out, one of them being Edward English, the share going to him being taken in the name of John K. Ottley as his trustee. All of the other persons taking under such apportionment were parties to the contract; and all were made parties defendant to this action, except Edward English or John K. Ottley as his trustee. On the 11th day of July, 1900, all of the stock of the corporation being held by the Lowe estate and by James W. English Sr., and the members of his family and John K. Ottley, as hereinbefore stated, a written contract was entered into by all the persons owning all the stock of the corporation, except that held by the executors of W. B. Lowe deceased. The executors of the Lowe estate holding 807 shares (a minority of the entire capital stock of the corporation) did not enter into the contract. A copy of the contract was attached to the petition as an exhibit, and was as follows:

"Whereas James W. English is the owner of 1026 shares of the capital stock of the Chattahoochee Brick Company, a corporation duly chartered and incorporated under the laws of said State, with its principal office in the city of Atlanta, State and county aforesaid, the said named shares being a majority of the capital stock of said company, and whereas the following named persons are each the owners of the numbers of shares only of the capital stock

of said company which is set opposite their names in the schedule below, they being therefore minority stockholders in the said corporation (the said Rebecca Lowe English, whose name appears in said schedule, being, in addition to the number of shares therein stated, likewise interested in the stock owned by the estate of W. B. Lowe, late of said county, deceased), that is to say names of stockholders: James W. English, 1026 shares; J. W. English Jr., 80 shares; Rebie Lowe English, 80 shares; Emily A. English, 1 shares; Emily English Robinson, 1 shares; Harry L. English, 1 shares; Jennie English, 1 shares; James D. Robinson, 1 shares; John K. Ottley, 1 shares; John K. Ottley, as trustee for Edward English, 1 shares;

" And whereas, the said shareholders above named are each of the opinion that the interests of the aforesaid corporation as well as their own, and the interests of all other stockholders who may be interested in said corporation, require unity of action on the part of the said shareholders above named in the matter of the conduct of the affairs of the said corporation, in order to insure the continuance of the wise, conservative, honest, and economical management of the affairs of said corporation, such as has characterized its management in the past, and in order to prevent said corporation from being in any manner exposed to the manipulations and devices of stock speculators and corporation wreckers; and whereas it is believed by the shareholders above named that such unanimity of action and such protection of their respective interests and the interests of the other shareholders in the said corporation can be best assured by the manner and means herein provided:

" It is therefore, in consideration of the premises herein and in consideration of the advantages which will herefrom result to the stockholders generally, as well as for and in consideration of the special advantages which will result to the corporation itself and as well to the said shareholders, it is hereby mutually agreed between the said shareholders, each with the other, that until the 22nd day of June, 1945, unless the said several parties hereto shall sooner in writing mutually otherwise agree, that said stock that is now held, or any of the said stock of said company which may hereafter be bought or acquired by any or either of the said several parties hereto, shall at all corporate meetings of said corporation

be voted as a unit, and to that end the said owners of the several shares of stock herein mentioned do by these presents hereby constitute and irrevocably appoint James W. English, and his successors as herein provided, to be their lawful agent and attorney for them and in their several names to vote said shares of stock at all corporate meetings of the stockholders of said corporation, subject only to the conditions and limitations hereinafter expressed.

" Should the said James W. English depart this life prior to the expiration of this agreement, or otherwise become unable to discharge the duties herein imposed upon him as such agent and attorney, then and in that event it is agreed that such agency shall devolve upon his heirs, together with Rebie Lowe English, and they jointly are authorized to represent the said shareholders and vote said stock in all respects as though the same had been done by James W. English. In the event a disagreement should arise among the heirs of James W. English, together with Rebie Lowe English, as to how said stock shall be voted touching any business of the corporation which shall require a vote of the stockholders, then and in that event the minority and majority of the persons constituting the heirs at law of James W. English and Rebie Lowe English shall each select a disinterested person to whom the difference of opinion among the aforesaid parties shall be submitted; and if these two parties so selected shall fail to agree, they shall select a third disinterested party and they three shall pass upon the differences of opinion as submitted and decide the questions at issue, and their decision shall be final. The limitations and conditions above referred to and herein expressed are as follows:

" First: During the lifetime of the said James W. English said stock shall be voted by him annually for such one of the shareholders of the said company as he may designate for the office of president thereof. In the event of his death the said stock shall be by his successors, as hereinbefore provided, annually voted for James W. English Jr. as the president of said company. And should the said James W. English Jr. die before the time limited for the expiration of this agreement, then the said stock shall thereafter be annually voted for Harry L. English as the president of said company. During the lifetime of James W. English the said stock shall be voted for James W. English Jr. as the vice-

president of said corporation; and should the said James W. English Jr., in the meantime, depart this life, then the said stock shall be voted for Rebie Lowe English, his wife, as vice-president of the said company.

"If under the provisions of this agreement as hereinabove stated James W. English Jr. shall be chosen to be president of said company, then thereafter during the life of the said James W. English Jr. the said Harry L. English shall be elected vice-president of said company. In the event the said James W. English Jr. and the said Harry L. English should each depart this life during the continuance of this agreement, then the said shares of stock shall be voted in the election of president of said corporation for such person, being a stockholder of said corporation, as may be designated by the heirs at law of the said James W. English. And should a disagreement arise between the said heirs at law as to the person to be elected president, then those of the heirs at law of the said James W. English owning a majority of the said mentioned stock and those of the heirs at law of the said James W. English owning a minority of the said mentioned stock shall each select a person who shall designate from those owning stock in the company a person to be elected president. Should those two persons so elected disagree as to whom should be elected president, then and in that event they shall select a third person to act as umpire; and the majority of the three persons so named are hereby authorized and empowered to cast the votes of the said stock for such person as they may designate for the office of president.

"It is further mutually understood and agreed by all the parties to this agreement that in the event of the death of James W. English Jr., the authority hereinabove conferred upon James W. English and his successors as herein provided, to cast the vote of said stock, shall be and is hereby vested in Rebie Lowe English alone, in so far as the same shall relate to the election of a vice-president of said corporation; and should the said Rebie Lowe English so desire, she is hereby authorized and empowered, and upon her to that extent all necessary authority is conferred, to cast the vote of the entire aforesaid stock owned or held by the aforesaid parties now, or which they may hereafter own or acquire, annually for such stockholder in said company as she may designate

for the office of vice-president of said company; and this authority is especially conferred to the end that she may, if she sees proper, vote the entire aforesaid stock for herself for the office of vice-president annually during the continuance of this agreement, if she should so long desire, it being now and here admitted that she is, in the opinion of each of the parties hereto, in all respects well qualified and fully competent to discharge the duties of said office.

" Second: It is mutually agreed and understood between the parties hereto, that in the event of the death of Rebie Lowe English the stock owned or held by her in said corporation may, on demand, be delivered to her heirs at law, provided such heirs at law be persons other than James W. English Jr., or the descendents of the said James W. English Jr. and Rebie Lowe English. In the event the said heirs be other than the said James W. English Jr., or the descendants aforesaid, all relations between the said Rebie Lowe English, as well as those of her heirs at law, shall cease and determine between herself and the other parties to this agreement, and her said stock and any stock to which she would have been entitled shall be withdrawn from the operation hereof and delivered to the representatives of her estate.

" Third: In the event of the death of the said James W. English, the said shares of stock shall be so voted as to authorize, by a change of the by-laws, an increase of the number of directors to eight or more, and in such manner as to authorize the election of an attorney to represent the said corporation, if such an officer should be deemed necessary. In the event of the death or disability of any director, said number shall be diminished in like manner. And whereas in the event named, that is to say the death of James W. English, the said persons whose names are hereinafter immediately written will in all probability then be more largely interested in the stock of said company, and whereas they do by these presents pledge themselves to co-operate each with the other in furthering the interests of said corporation, it is hereby agreed that the belowed-named persons shall be annually elected directors of said corporation, if in life and they be then mentally competent to discharge the duties of the office; that is to say, Emily A. English, James W. English Jr., Emily English Robinson, or her husband, J. D. Robinson, as they may decide,

Harry L. English, Rebie Lowe English, Jennie English, and John K. Ottley, who shall be annually elected until such time as Edward English shall attain his majority, at which time he, the said Edward English, may, if competent to discharge the duties of the office, be elected to succeed John K. Ottley as a director and be annually thereafter so elected.

"Fourth: The said shares of stock shall be voted in such a manner as to authorize the payment to the president and vice-president of a salary of two hundred and fifty ($250) dollars per month, which salary shall be paid monthly on the 20th day of each month cut of the net earnings of the said company after the payment of all current bills for the month preceding, which bills shall be paid on or before the 15th thence immediately preceding, and the said named salaries shall not otherwise be paid, and money shall not be borrowed for the purpose of paying salaries, nor shall they be increased during the continuance of this contract. Said stock shall not be voted during the continuance of this contract so as to authorize the creation for said corporation of any new salaried offices without the unanimous consent in writing of all the parties hereto, and then only when the interests of said corporation shall seem so to require, nor shall it without such consent be voted in such manner as to authorize the sale or incumbrance of the corporate business or franchises or an increase of the capital stock of said corporation. Said stock shall under no circumstances be voted in such manner as to render any shareholder in said corporation ineligible to election as director or officer therein, the rights of all shareholders being equal and entitled to be respected.

"Fifth: It is further agreed that during the continuance of this agreement neither of the shareholders herein mentioned will sell, hypothecate, transfer, or assign their said shares of stock or any part thereof or any which they or either of them may hereafter acquire, to any person other than one of the parties hereto, without first having given to each of the other parties hereto a fair opportunity to purchase said stock or such portion thereof as they might desire at its then market value; and if disagreement shall arise between the person offering to sell and the person proposing to buy as to what is the market value of said stock, such disagreement shall be submitted to the appraisal of three

disinterested persons, one to be selected by each of the parties disagreeing and a third by the two persons so chosen, and the appraisement of the three persons so chosen shall be between said persons be conclusive as to the market value of said stock, and that all such shares of stock as may be hereafter owned or acquired by any of the parties to this agreement in addition to those now covered by this agreement shall be immediately merged with the other shares herein stated, and the agency herein created shall without further agreement extend to and cover said shares. In the event said stock or any part thereof shall be sold to any person not a party to this agreement, the same shall be herefrom immediately withdrawn, and the purchaser thereof shall not in any wise become a party to this agreement or entitled to any voice in the control of the stock covered hereby, remaining in the hands of the parties hereto. It is further agreed that upon each certificate of stock issued to or held by the parties to this agreement there shall be endorsed thereon the following words: ' Within shares of stock are held subject to a contract and agreement executed in quadruplicate on the 11th day of July, 1900, by and between James W. English, James W. English Jr., Emily A. English, Rebie Lowe English, Emily English Robinson, J. D. Robinson, Harry L. English, Jennie English, John K. Ottley, and John K. Ottley as trustee for Edward English.'

" The said shares of stock shall be deposited with James W. English as trustee, who shall issue to each of the parties hereto a certificate setting forth that the entire number of shares of stock so deposited are held by said trustee subject to the joint instructions only of the said several parties hereto and to such instructions to be given as herein provided only. That the same cannot be withdrawn, sold, hypothecated, transferred, or assigned to any person not a party hereto, except with the unanimous consent in writing of the other parties hereto. And each of the parties hereto and their heirs are authorized to draw in person from said company such dividends as may accrue to him or her by reason of the shares of stock that such person may now own or may hereafter acquire. In the event of the death of James W. English, trustee, his successor in such trust shall be appointed by the remainder of the parties to this agreement who may be then in life; and in the event of a disagreement among the said parties

as to the person to be chosen as trustee, a majority of them shall have authority to name the trustee. And the said trustee so named shall enter upon and assume all the duties and responsibilities imposed upon the said James W. English as trustee.

"This agreement may be changed or amended only in the following manner: During the lifetime of James W. English it may be changed and amended in any respect by and with the consent in writing of James W. English, James W. English Jr., and Rebie Lowe English; and in the event of the death of James W. English it may be changed or amended with the written consent of all the parties hereto, except in so far as the same makes provision for the payments of salaries for the president and vice-president, and except in so far as the same provides against the sale and incumbrance of the corporate business or franchises and the increase of the capital stock of the said corporation, and with respect to these matters the said agreement shall not be changed, nor shall said stock be voted in such manner as to authorize any conduct contrary to those provisions of this contract during the term fixed for its continuance.

"Should any disagreement arise at any time among the parties hereto touching the meaning of this agreement or any clause thereof, then such disagreement shall be submitted in writing to three disinterested parties, who shall interpret said agreement with respect to the matter then in question, and their decision as to its intent and meaning shall be final. Said disinterested parties to whom the matter of such disagreement shall be referred shall be selected as follows: The minority and majority of the parties hereto shall each select a man; and if they fail to agree, the two so selected shall select a third man; and the decision of the majority of the board so chosen shall be final.

"In witness of all of which the parties hereto have each interchangeably set their hands and seals on this the 11th day of July, 1900."

The foregoing instrument was signed by each of the persons who are named as parties to the contract. At the time of execution of the contract petitioner, as a legatee under the will of W. B. Lowe Sr., had title to an undivided one-third interest in the shares held by the Lowe estate; and on April 6, 1903, she became the sole holder to the legal title to all of the Lowe shares of stock,

and remained such owner thenceforward; and the defendants knew of such ownership at the time of the alleged breach of the contract. James W. English Jr. died in 1914. Prior to his death the petitioner had been granted a total divorce from him, and had intermarried with her present husband, Baron Marcus Rosenkrantz. Upon the death of James W. English Jr., petitioner became entitled, under the above-quoted contract, to vote all the stock covered by the contract for the vice-president, and could vote it for herself unless she chose to designate some one else. During the entire time up to the death of James W. English Jr., James W. English Sr. continued to exercise powers under the contract and to carry it out. As late as November 16, 1912, which was after petitioner's divorce from James W. English Jr. and her marriage with her present husband, James W. English Sr. wrote petitioner a letter referring to the contract, and stating: " I signed it and expect to live by it, as I do by all contracts I make." At a stockholders' meeting held July 2, 1914, petitioner, who had become sole executrix of the estate of William B. Lowe Sr., in which name the 807 shares of Lowe stock stood, was represented by her husband Baron Marcus Rosenkrantz by proxy. At that meeting a resolution was offered, providing that the officers of the company should be named and thereafter be elected by the board of directors, and their compensation be fixed by said board. Petitioner's husband offered as an amendment a resolution, which was seconded by Mr. Bidwell, representing one share of stock, that the above contract of July 11th, 1900, be filed with the board, and that they should vote in accordance therewith for the officers named therein. This amendment was defeated by the vote of all shares except those voted by Baron Rosenkrantz; and the original resolution, without amendment, was carried by the same vote. Afterwards the petitioner attended the annual meeting of stockholders of the corporation, held on January 24, 1916, at which she proposed, under the terms of the contract, to cast the vote therein mentioned for herself as vice-president, together with the shares of stock known as those of the W. B. Lowe estate; and she announced, by a written statement, that she did thus cast such shares for herself, the same constituting the entire capital stock of the company. At a meeting of the board of directors held immediately after the stockholders' meeting, that body ignored the

action of petitioner and elected James W. English Sr. as president and his son Harry L. English as vice-president, all directors voting for the said Harry L. English as vice-president except the petitioner, she stating that she claimed to have elected herself vice-president of the company at the stockholders' meeting, and hence voted " No." Harry L. English was declared elected vice-president. It was alleged, that this action was in violation of petitioner's rights under the contract; that petitioner had been deprived of a salary of $250 per month or $3000 a year, attached to the office, which salary has been paid, since the inception of the agreement in July, 1900, to the persons recognized as vice-president; that the defendants have expressly repudiated the contract and denied that it has any force or effect, and petitioner is therefore entitled to sue for damages for the breach of the entire contract for the full term thereof; that the contract vests in her the right to receive the salary of $3000 per year until and through the year 1945; and she asks damages in the sum of $100,000.

The grounds of demurrer to the petition were: (a) that the petition shows no cause of action and no right of recovery; (b) that the contract, Exhibit A, was illegal and void and contrary to public policy; (c) that there was no consideration for the contract, and it was nudum pactum; (d) that the petitioner, having remarried, was not entitled to the office, benefits, or emoluments of the contract, even if it was originally valid. After stating the facts, the division of the Court of Appeals having the case for decision rendered the following opinion in which two of the Judges concurred: " The court did not err in any of its rulings on the pleadings. The petition set out a cause of action. The Chattahoochee Brick Company, referred to in the contract declared on, is a private business corporation which has no functions of a public character; the contract is based upon a sufficient consideration, is not void as being contrary to public policy, and is a valid contract binding upon the parties thereto; and the petitioner did not lose any of her rights under the contract by reason of her divorce and subsequent remarriage, nor by the death of her first husband, James W. English Jr." The other judge dissenting stated: " I can not concur with the conclusion reached by the majority of the court. See *Morel* v. *Hoge,* 130 *Ga.* 625 (61 S. E. 487, 16 L. R. A. (N. S.) 1136, 14 Ann. Cas. 935).

47

*Brewster, Howell & Heyman* and *Mark Bolding,* for plaintiffs in error.

*V. A. Batchelor* and *Spalding, MacDougald & Sibley,* contra.

ATKINSON, J. 1. The action is for damages for alleged breach of the contract set forth at length in the statement of facts, by preventing the plaintiff as a stockholder from voting all of the stock of the corporation for herself as vice-president under provisions of the contract, and thereby depriving her of stipulated salaries pertaining to the office. The action was instituted after the decision of this court in *Rosenkrantz* v. *Chattahoochee Brick Company,* 147 *Ga.* 730 (95 S. E. 225), being a suit for specific performance, in which the judgment of the trial court dismissing the petition on general demurrer was affirmed. A controlling question is whether the contract is void on the ground that it is contrary to public policy. Prior to the purchase of the Steele stock, which was arrayed against James W. English Sr., the latter did not have a majority of the stock of the corporation. After acquisition of the Steele stock English and his family, including the plaintiff, who for convenience may be called the English faction, had a majority of the stock, which enabled them to dominate the corporation, while the Lowe estate, who for convenience may be called the Lowe faction, had a substantial minority amounting to more than one third of the total stock of the corporation. While the plaintiff owned an undivided interest in the stock held by the Lowe faction, she allied herself with the fortunes of the English faction, and was a party to the written pooling contract of date July 11th, 1900. By the terms of this contract all of the stock held by the English faction was pooled for voting purposes, so that one person might exercise the voting power for all of the stock, whether or not its business was being operated wisely and to the best interest of the corporation or the stockholders as a whole. The contract was irrevocable and unchangeable, except upon mutual consent of all the parties thereto. The corporation was organized in 1895, under the provisions of the statute which is now found in the Civil Code, § 2823, and its period of existence fixed by statute was 20 years from the date of the charter subject to renewal. Under the provisions of the contract salaries to be paid out of net earnings of the corporation were provided for the president and vice-president, not to exceed $250 per month

respectively; and the right to hold such offices in the corporation was confined to members of the English faction, and should exist during the full term of the contract, which was 45 years from its date, being more than twice the term of the life of the corporation. The order in which different members of the English faction should become entitled to hold the offices of president and vice-president was provided for on the basis of survivorship of James W. English Sr., James W. English Jr., Harry L. English, and the plaintiff, during the period of the contract. The plaintiff should become entitled to the office of vice-president on the death of her husband James W. English Jr. Salaried offices above mentioned were to be held as above indicated, irrespective of whether or not it would be to the best interest of the corporation and the stockholders as a whole to have such persons hold the offices or to pay the salaries attached thereto. While the salaries were payable out of the net income, if the net income should not be more than sufficient to pay the specified salaries it would be possible to consume the whole of the net income in paying salaries, thus leaving nothing to be paid as dividends upon any of the stock in the corporation. Under such circumstances the holders of the majority stock who were not president or vice-president, and of course the minority stock held by the Lowe faction which was outside the contract, would be under a great disadvantage. The plaintiff allied herself with the English faction, and indirectly through her husband, and directly as a prospective vice-president herself, had peculiar advantages under the contract in which her co-owners of the Lowe stock did not share. They could have no voice in the management or policy of the corporation during the whole term of the contract, whether or not the faction in control wisely and successfully conducted the business of the corporation. In such circumstances the tendency of the contract was to depress the value of the Lowe stock while in the hands of Mrs. Lowe and W. B. Lowe Jr., and cause it to gravitate towards the plaintiff or other members of the English faction, parties to the contract, who might be willing to buy at some reduced price. In the circumstances, while the facts differ somewhat from those involved in *Morel* v. *Hoge,* 130 *Ga.* 625 (supra), the principles there ruled are applicable and controlling. In that case all of the stock of the corporation was represented in a contract, which in effect gave one faction of stockholders the right to permanently

elect a majority of the directors, and thus render it possible for a minority of the stockholders in the corporation to control the policies and affairs of the corporation, whether or not the management was for the best interests of the corporation or its stockholders as a whole. The contract was held to be void as against public policy. The opinion is so apposite that it will be restated:

" The contention of the Morel faction is, that an agreement was entered into between it and the Hilton faction, which agreement was a condition precedent to the incorporation of the Sylvania & Girard Railroad Company, to the effect that, in consideration of the Morel faction subscribing for 50 of the total number of 100 shares of the capital stock of the company, the Morel faction should permanently have the right of selecting and having elected three of the five directors of the company, ' and thus exercise a control over the company and its affairs.' Granting that the allegations of the answer are sufficient to sustain this contention, the question for adjudication is whether such agreement is valid. The company was incorporated by the Secretary of State, under the provisions of the Civil Code, § 2159 et seq. In § 2163 it is provided: ' The board of directors shall select from their number a president, and may elect one or more vice-presidents, and may appoint a secretary, a treasurer, and such other officers and agents as they may deem necessary." Therefore, if the Morel faction has the right, by virtue of the agreement, to have elected a majority of the directors of the company, favorable to the interests of that faction and willing to carry out its policies in the management of the corporate affairs, and the members of the Hilton faction are bound by the agreement to so vote their stock as to enable the Morel faction to exercise such right, then the last-named faction may indefinitely control the entire management of the company, and accordingly name all its officers and agents, fix their compensation, and choose any of them from among the shareholders identified with such faction, even though it may own, as is now the case, only a minority of the corporate shares. In Shepaug Voting Trust Cases, 60 Conn. 579 (24 Atl. 41), Robinson, J., said: . . ' the duty which each stockholder owes his fellow stockholder [is] to use such power and means as the law and his ownership of stock give him, that the general interest of the stockholders shall be protected and the general welfare of the corporation sustained, and

its business conducted by its agents, managers, and officers, so far as may be, upon prudent and honest business principles, and with just as little temptation to and opportunity for fraud, and the seeking of individual gains at the sacrifice of the general welfare, as possible. . . He may shirk it perhaps by refusing to attend stockholders' meetings, or by declining to vote when called upon, but the law will not allow him to strip himself of the power to perform his duty.'

"In Cone v. Russell & Mason, 48 N. J. Eq. 208 (21 Atl. 847), the owners of a majority of the shares of a transportation corporation mutually agreed to execute, and did execute, a proxy purporting to be irrevocable for five years, authorizing the persons therein named to vote at all stockholders' meetings; and they on their part agreed to so vote that one of the parties to the agreement should be continuously employed as a manager of the corporation, at a salary specified in the agreement. This agreement was held to be against public policy, and therefore void, upon the ground that it was the obligation of corporators and shareholders to attend in person and execute the trust or franchise imposed upon them, and that the good of the public required that each stockholder should exercise his individual judgment as to all matters presented. In the opinion delivered for the court, Pitney, V. C., quoted the language of Chief Justice Shaw, in Fuller v. Dame, 18 Pick. 484, as follows: 'Mr. Fuller was one of the original proprietors of the Worcester Railroad. His associates had a right to believe that, in all his acts as such stockholder, in choosing directors, in framing by-laws, and in doing other acts, pursuant to the powers of the corporation, he had a common, and, in proportion to his shares, an equal interest, and they had a right to rely on his judgment, his recommendations of directors, and other acts, with all the confidence inspired by such a belief.' There are a number of other cases in which it has been held that agreements between stockholders, that particular persons shall fill the offices of a corporation and draw designated salaries, impair the duty of stockholders to choose for their officers such persons as are best adapted to promote the welfare of the corporation. Among them are Guernsey v. Cook, 117 Mass. 548, s. c. 120 Mass. 501; Woodworth v. Wentworth, 133 Mass. 309. In White v. Thomas etc. Co., 52 N. J. Eq. 178 (28 Atl. 75), the holder of certain patents

agreed with several capitalists to form a joint stock company, a portion of the capital stock of which was to be issued to him in payment of patents to be assigned to the corporation, another portion to be issued to the capitalists for funds to be advanced by them in exploiting the patents, and the remaining shares were to be held in the treasury for sale. It was agreed that the shares other than those left in the treasury were to be transferred to a trustee, to be held for the term of ten years, and were by him to be so voted at the elections of the directors that the patentee should nominate and elect a minority of the directors, and the holders of the remainder of the stock should elect the majority. After the shares reserved in the treasury were sold and the purchasers thereof had also purchased of the patentee the greater portion of his stock, a suit was brought by such purchasers against the trustee, to restrain him from voting at an approaching election the shares of stock thus held by him in trust, and to have the agreements under which he held them cancelled and set aside. The court, relying upon the general principle that the right to vote stock ' can not be separated from the ownership in such sense that the elective franchise shall be in one man, and the entire beneficial interest in another, nor to any extent, unless the circumstances take the case out of the general rule,' declared the trust in question void, and granted the relief sought by the complainants. In Harvey *v.* Improvement Co., 118 N. C. 693 (24 S. E. 489, 32 L. R. A. 265, 54 Am. St. R. 749), it was declared, that ' each stockholder, whether by himself or his proxy, must be free to cast his vote for what he deems the best interest of the corporation, the other stockholders being entitled to the benefit of such free exercise of his judgment by each ; and hence any combination or device by which a number of stockholders shall combine to place the voting of their shares in the irrevocable power of another is held contrary to public policy,' and ' power to vote is inherently annexed to, and inseparable from, the real ownership of each share, and can only be delegated by proxy with power of revocation.' So in Gage *v.* Fisher, 5 N. Dak. 297 (65 N. W. 809, 31 L. R. A. 557), one of the grounds upon which the transaction therein involved was held to be void was that each stockholder in a corporation has the right to demand that every other stockholder, if he desires to do so, shall have the right to exercise at each annual meeting ' his own judgment as to

the best interest of all the stockholders, untrammeled by dictation and unfettered by the obligation of any contract.' We are aware that there are some cases in which a contrary principle is announced, but, in our opinion, the cases cited announce the better doctrine. One of the cases holding contrary to our opinion is Smith v. San Francisco & N. P. R. Co., 115 Cal. 584 (47 Pac. 582, 35 L. R. A. 309, 56 Am. St. R. 119), the soundness of which, we think, is very justly criticised in a note following a report of the case in 56 American State Reports, 119. In that case it may be noted that the contract involved was limited to five years.

" In the instant case the motives of Morel and those acting with him may be for the promotion of the prosperity of the corporation and the welfare of the majority of its stockholders, but, in passing judicially upon the question as to the validity of the contract set up by them, and under the terms of which they claim the right to indefinitely control the affairs of the corporation, we must look alone to what such contract permits to be done, if the parties, or any of them, choose to press the privileges which it confers. According to the authorities we have cited, it is the theory of the law that the holders of the majority of the shares of stock in a corporation may control its management, and every person who becomes an owner of stock therein has a right to believe that the corporation will, and to insist that it shall, be managed by the majority. Morel and his friends owned only 50 shares of stock, just half of the whole number of shares, at the time the agreement in question was entered into; now they own only 45 shares, one of their number, contrary to an agreement entered into by them among themselves, having sold his five shares; and it is this minority which claims to have the right to control the corporate affairs by dictating the majority of the directors to be elected. To illustrate how small a minority might exercise such right under the alleged agreement, suppose none of the other members of the Morel faction should sell, and they should agree among themselves to vote their stock as a unit, as determined by ballot, then 23 shares would control. If this could be done, then the owners of such 23 shares could agree among themselves that they would hold meetings, and by a majority of their shares determine how all the 23 votes should be cast in the meeting to be held to determine how the 45 shares should be voted; and if so, then 12

shares could determine the whole policy of the corporation, though the Hilton faction should own 25 shares, Hoge 25 shares, and Mills 5 shares, as seems now to be the case, as the answer charges merely on belief that Hilton is the real owner of the shares standing in the names of Hoge and Mills.

" Our conclusion is that the contract set up by the respondents to the rule, as cause why mandamus absolute should not be granted, is against public policy, and therefore void, because it indefinitely deprives the owners of the stock constituting the Hilton faction, though they may have a majority of the stock, of the power to exercise their right as well as their duty to the other stockholders, present or future, and to the public, to so vote in the election of directors for the company as will in their judgment promote its prosperity and best enable it to perform its duties to the public, and because it gives the · shareholders of· the Morel faction, even though they may own but a small minority of the stock, the right to indefinitely control the affairs of the corporation, including the right to fix the compensation of its officers and agents and to fill any of such positions from among their own members. It follows that the court did not err in rendering the judgment of which complaint is made."

The connection in which the Court of Appeals uses the language, " The Chattahoochee Brick Company, referred to in the contract declared on, is a private business corporation which has no functions of a public character," shows a misconception of the foregoing opinion. It is true that in the concluding paragraph of the opinion, stating reasons why the contract was void as against public policy, it was said that the stockholders owed a duty " to the public, to so vote in the election of directors for the company as will in their judgment promote its prosperity and best enable it to perform its duties to ·the public," but that was only one reason, and the language employed did . not mean that in order to make the rule applicable the corporation must be what is commonly called a public-service corporation. Other reasons were stated, all of which were discussed in the opinion based on principles applicable to contracts of the character involved, irrespective of the quasi-public or private character of the corporation, or whether its functions were private or public. Numerous prior decisions of other courts, not cited in the opinion, as well as subsequent

decisions might be cited, holding such contracts void as against public policy, without regard to the public or private character of the corporation. However the decision above mentioned by this court is the law of this State, and it would be useless again to enter into further discussion of the case. The case was distinguished in *Simmons* v. *Atlanta Telephone &c. Co.*, 139 *Ga.* 488 (77 S. E. 377), but not on the ground of the character of the corporation the stock of which was involved. The corporation in that instance was a quasi-public corporation, being a telegraph and telephone company. The nature of the contract upon which the present action is founded need not be again stated. Sufficient has been said of it to show that under application of the principles applied in the opinion in *Morel* v. *Hoge,* supra, it is void because it is against public policy, and its breach does not afford the plaintiff a cause of action. Under this view it is unnecessary to deal with other grounds of attack on the contract raised by the demurrer.

2. . The trial judge sustained a special demurrer and ordered paragraph ten stricken from the petition. The cross-bill of exceptions assigns error on this ruling. The Court of Appeals affirmed the judgment on the cross-bill of exceptions. The substance of paragraph ten is not of such materiality as renders it necessary to be stated. It is sufficient to state that there was no error in the ruling made.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill. All the Justices concur.*

HILL and GILBERT, JJ., concur specially in the judgment on the main bill of exceptions.